COMMONWEALTH vs. JAMAAL HAITH.

Norfolk. September 5, 2008. - October 16, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & BOTSFORD, JJ.

*Homicide. Telephone. Evidence,* Photograph, Relevancy and materiality. *Defense of Others. Practice, Criminal,* Capital case, Motion to suppress, Instructions to jury.

A Superior Court judge properly denied the criminal defendant's motion to suppress statements he made in North Carolina to Massachusetts State troopers following his arrest by Federal authorities on the ground that he made those statements before he had been afforded his statutory right to make a telephone call pursuant to G. L. c. 276, § 33A, where, even accepting that the troopers were under a statutory duty to advise the defendant of his right to use the telephone, the troopers did not purposefully violate that duty. [412-414]

At the trial of an indictment charging the defendant with murder in the first degree, the judge did not abuse her discretion in admitting in evidence an autopsy photograph of a screwdriver protruding from a wound in the victim's skull, where the photograph was relevant to show that the killing was committed with deliberate premeditation or with extreme atrocity or cruelty. [414-415]

At the trial of an indictment charging the defendant with murder in the first degree, the judge did not err in refusing to give the defendant's requested instruction on manslaughter based on imperfect defense of another, where no view of the evidence warranted such an instruction. [415-416]

This court declined to set aside or reduce a verdict of murder in the first degree, where the manner of the victim's death was prolonged and gruesome, and where the jury were properly instructed as to aggravating factors and could have found every one of them present beyond a reasonable doubt. [416]

INDICTMENT found and returned in the Superior Court Department on February 28, 2002.

A pretrial motion to suppress evidence was heard by *Wendie I. Gershengorn*, J., and the case was tried before *Barbara A. Dortch-Okara*, J.

*Janet H. Pumphrey* for the defendant.

*Pamela Alford*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court found the defendant guilty of murder in the first degree, based on theories of deliberate premeditation and extreme atrocity or cruelty.[1] Represented by new counsel on appeal, the defendant argues that statements made in North Carolina to Massachusetts State troopers following his arrest by Federal authorities should have been suppressed. He also asserts that the trial judge[2] erred by admitting in evidence an autopsy photograph of a screwdriver protruding from a wound in the victim's skull, and by refusing to instruct the jury on the law of imperfect defense of another. Finally, the defendant requests this court to exercise its power under G. L. c. 278, § 33E, to reduce the conviction of murder or to order a new trial. We affirm the judgment of conviction and discern no basis to grant relief under G. L. c. 278, § 33E.

The defendant admitted that he killed the victim, Manuel Andrade. His sole theory of defense was that he was tricked into doing so by Zeno Williams, his codefendant and the mother of his two children, who had convinced the defendant that their children would be in physical danger if the victim were allowed to live. The jury could have found the following facts.

On Sunday, January 20, 2002, the defendant and Williams stayed overnight at the apartment of Dedrick Cole, a friend of the defendant. They informed Cole of a plan to kill an individual in Stoughton and offered Cole $5,000 to be a third participant. Williams stated that they wanted to kill the individual because he was testifying against some of her family members in an upcoming drug case.[3] The defendant explained that "[w]e had to take somebody out." Cole refused to become involved.

On the evening of Monday, January 21, the defendant and Williams broke into an apartment building in Stoughton where,

---

[1]The Commonwealth had also proceeded under a theory of felony-murder, which the jury rejected. The jury acquitted the defendant on an additional charge of armed robbery. After trial, the Commonwealth nol prossed a conspiracy charge on which the defendant had been indicted.

[2]The judge in the Superior Court who heard, and denied, the defendant's motion to suppress was not the same judge who presided at the defendant's trial.

[3]Based on the evidence, the jury could have found that the victim had broken off an extramarital affair (the victim was married) with Williams a few days prior to the killing.

Williams knew, the victim lived on the second floor. Williams also knew that the victim would not be returning home until early the next morning.[4] The defendant and Williams fell asleep on the floor of the apartment building's laundry room and were awakened, at approximately 9 A.M. the next morning, when a tenant opened the laundry door and hit one of them in the leg. Williams checked the parking lot and reported to the defendant that the victim's truck was there. The defendant, posing as a maintenance man, knocked on the victim's door while Williams hid. When the victim came to the door, the defendant stated that there was a leak coming from his bathroom. The victim turned his back, and the defendant and Williams entered the apartment.

The defendant tried to snap the victim's neck and struck the victim in the head several times. The men struggled to the floor; the defendant got the victim in a choke hold; and the victim bit the defendant's hand. The defendant yelled to Williams to get him something. Williams returned with a screwdriver, which the defendant used to stab the victim in the head several times. (A bent screwdriver was later found at the scene of the killing.) When the defendant stabbed the victim in the ear with the screwdriver, the victim became weak and, although alive, no longer struggled. The defendant then wrapped an electrical cord around the victim's neck and strangled him until he stopped moving.

The defendant and Williams remained in the victim's apartment for two to three hours. They attempted to clean the victim's blood from the walls and floor. They placed the victim's body in a plastic trash bag with the plan to dig a hole and bury him, but were interrupted by banging on the front door, and then on the balcony sliding door.[5] The defendant and Williams left the body in the trash bag; grabbed the victim's money, credit cards, and passport; left the apartment by the back door; and telephoned to have a taxicab take them back to Cole's apartment. Over the next few days, the defendant and Williams traveled by train and bus to North Carolina in an attempt to reach Jamaica.

The defendant was arrested on February 11, 2002, in Fay-

[4]The victim owned a cleaning business and had worked until the early hours of January 22, 2002.

[5]The person banging on the doors was Maria DiMiranda, a friend and employee of the victim.

etteville, North Carolina, by United States marshals on a Massachusetts warrant. Later that day, while still in North Carolina, the defendant made statements to Massachusetts State troopers in which he admitted the details of the killing, as described above. The defendant first told the troopers that he did not know anything about the victim and had never seen him before the day of the killing. He then stated his alleged belief that the victim was going to "snitch" on Williams's family, who had promised the defendant $30,000 and a cruise to Jamaica in return for killing the victim. The defendant told the troopers that Williams said, "This is a way to help your children. You have children, and this money will come in handy to help them." This, the defendant told the troopers, was why he agreed to kill the victim.

1. The defendant filed a motion to suppress his statements made in North Carolina because they were made before he was afforded his statutory right to make a telephone call pursuant to G. L. c. 276, § 33A.[6] The motion was denied. The motion judge (not the trial judge, see note 2, *supra*) made the following findings of fact. After the defendant's arrest in Fayetteville, Federal authorities notified the Massachusetts State police that the defendant would be held by United States marshals in Raleigh. By the time the troopers reached the defendant, he had been in Federal custody for approximately six hours. The troopers read the defendant his Miranda rights using a Federal form that did not include the defendant's statutory right, under Massachusetts law, to make a telephone call. The defendant knowingly, readily, and willingly signed the waiver. The troopers then took the defendant's statement.

The defendant was held overnight in a State detention center in Raleigh. The next day, he was arraigned in a North Carolina county court and waived rendition. Arriving in Massachusetts

---

[6]General Laws c. 276, § 33A, provides:

"The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

with the troopers that afternoon, the defendant was taken directly to the Stoughton police department, where he was booked and informed of his right to make a telephone call. Shortly thereafter, the defendant did place such a call.

The defendant argues that his statements should have been suppressed, because at no point in the six hours between his initial arrest by Federal marshals and the subsequent arrival of the Massachusetts State troopers was he offered the opportunity to make a telephone call.[7] There appears to be no case law on the issue whether G. L. c. 276, § 33A, applies to Massachusetts law enforcement authorities when a person has been arrested by Federal authorities and is being held in Federal custody in another State. The defendant makes no argument, nor could he, that he was in Massachusetts custody at any point before he waived rendition on the morning after his interrogation.

We need not delve into the interstate reach of G. L. c. 276, § 33A, in these circumstances, however, because, even were we to accept the defendant's premise that the troopers were under a statutory duty to advise him of his right to use the telephone, the judge determined (and the defendant presents no evidence that would permit a conclusion that the judge's determination was clearly erroneous) that the troopers did not purposefully violate the duty. The statute's notification requirement is part of the initial booking process that takes place when an individual who has been arrested is brought to the police station in custody. It is settled that suppression is only an appropriate remedy for a violation of § 33A when the evidence demonstrates that law enforcement officers intentionally withheld the defendant's telephone right in order to coerce the defendant or to gain an advantage in the investigation. See *Commonwealth* v. *LeBeau*, 451 Mass. 244, 257 (2008). The defendant bears the burden of establishing an

---

[7]The judge specifically found that the Massachusetts troopers "never offered the defendant the use of a telephone, nor did the defendant ask to make a telephone call." The judge also found that the Commonwealth did not "know whether [the defendant] was offered the opportunity to make a call by the Federal Marshals before the Massachusetts State Troopers arrived at the Federal Marshal's office in Raleigh." The judge additionally noted that "[n]either the Commonwealth nor this court knows if the defendant was told he could make a call while in the county detention center, or if the defendant asked to make a call."

intentional violation of the statute. See *id.* at 258, citing *Commonwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003). That the defendant was far from home and, presumably, afraid during the time he was held in North Carolina does not support an inference of purposeful deprivation. The defendant's motion to suppress the statements, therefore, was properly denied.[8]

2. We reject the defendant's contention that an autopsy photograph showing part of the victim's shaved skull with a bent screwdriver inserted into a puncture wound was improperly admitted in evidence. "The admissibility of photographic evidence is left to the discretion of the trial judge, and we will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Gallagher*, 408 Mass. 510, 519 (1990), quoting *Commonwealth* v. *Waters*, 399 Mass. 708, 715 (1987). "In order to find an abuse of discretion, it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by [the trial judge]." *Commonwealth* v. *Anderson*, 445 Mass. 195, 209 (2005), quoting *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001).

The evidence at trial was overwhelming that, during his attack on the victim, the defendant stabbed the victim's head and neck repeatedly with a screwdriver. The medical examiner testi-

---

[8]The defendant raises the question whether the procedural law of North Carolina should apply to this case, because the interrogation took place in North Carolina or, in the alternative, because he was arrested in that State and held overnight in a North Carolina detention center. He argues that N.C. Gen. Stat. § 15A-501 (2007), which, similarly to G. L. c. 276, § 33A, provides that an arrested person must be advised "without unnecessary delay" of his right to communicate with counsel and friends, unconditionally required the troopers to advise the defendant of his option to use the telephone. The defendant did not appear to press this point before the motion judge, who considered the telephone issue only one of Massachusetts law. Even were we persuaded to agree with the defendant (after a full conflict of laws analysis based on the facts of this case), he would fare no better in his quest to have his statements suppressed. North Carolina law permits dismissal in cases where a defendant is denied permission to communicate with his attorney, see *State* v. *Hill*, 277 N.C. 547, 555-556 (1971), but requires first that a defendant demonstrate that the denial was "material and prejudicial." *State* v. *Curmon*, 295 N.C. 453, 456-457 (1978) (no prejudice when defendant, although not informed of his right to use telephone, waived Miranda rights and voluntarily gave statement). See *State* v. *Chapman*, 343 N.C. 495, 499 (1996). The defendant has not done so here.

fied at trial that the cause of death was strangulation, but that a contributing factor was multiple puncture wounds and trauma to the head.[9] The back of his neck showed six separate puncture wounds. The challenged photograph depicted the victim's skull (albeit shaved for autopsy purposes) as it might have been punctured by the bent screwdriver found at the scene of the killing. The photograph was relevant to show that the killing was committed with deliberate premeditation or with extreme atrocity or cruelty, elements necessary to prove murder in the first degree. There was no abuse of discretion.

3. The defendant presented evidence that Williams convinced him that his children would be in physical danger if he did not help her kill the victim. Based on this evidence, the defendant's trial counsel requested the judge to instruct the jury that, if they accepted the defendant's evidence as true, that evidence would support a finding that the defendant engaged in "imperfect defense of another" (his two children), and the jury would be justified in convicting the defendant only of manslaughter. The judge refused to give the requested instruction.

Voluntary manslaughter is an unlawful killing that occurs in circumstances that negate the element of malice. See *Commonwealth* v. *Squailia*, 429 Mass. 101, 109 (1999); *Commonwealth* v. *Acevedo*, 427 Mass. 714, 715-716 (1998); *Commonwealth* v. *Jefferson*, 416 Mass. 258, 262 (1993). Put another way, voluntary manslaughter is an intentional killing that is mitigated by extenuating circumstances. See *Commonwealth* v. *Jefferson, supra* at 262, 264. A manslaughter instruction is appropriate where the evidence shows that a defendant used excessive force in an otherwise appropriate exercise of self-defense or defense of another and that death resulted from the use of excessive force. See *Commonwealth* v. *Carlino*, 429 Mass. 692, 694 (1999), *S.C.*, 449 Mass. 71 (2007).[10] Even if, viewing the evidence in the light most favorable to the defendant, he acted under coercion or fear

---

[9]The medical examiner also testified that the victim had abrasions on his knees and shins, on his hands, on his face and lip, and on his neck. Almost all of the muscles of his anterior neck had blood in them, caused by external force, and there were hemorrhages on the inside of the victim's eyelids caused by external pressure on the neck.

[10]Deadly force used in self-defense is warranted only in circumstances where one "(1) had reasonable ground to believe and actually did believe that

that his children would be hurt if he refused to cooperate with Williams, there was nothing reasonable or appropriate about his brutal attack on, and admittedly purposeful murder of, the victim. No view of the evidence warranted a manslaughter instruction based on imperfect defense of another.

4. We have reviewed the entire record and find no reason to set aside or reduce, pursuant to G. L. c. 278, § 33E, the defendant's conviction of murder in the first degree. The defendant admits that he went into the victim's apartment with the express purpose to kill the victim. The manner of the victim's death, as described by the defendant to the State troopers, and as demonstrated by the injuries to which the medical examiner testified, was prolonged and gruesome. The jury were properly instructed according to *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-228 (1983), and, based on the evidence, could have found every *Cunneen* factor present beyond a reasonable doubt. See *Commonwealth* v. *Novo*, 449 Mass. 84, 99 (2007). That the defendant may have felt pressured by Williams to commit the murder does not entitle him to § 33E relief. See *Commonwealth* v. *Troy*, 405 Mass. 253, 263 (1989).

*Judgment affirmed.*

---

he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case." *Commonwealth* v. *Curtis*, 417 Mass. 619, 632 (1994). Deadly force against another to protect a third party is justified only when "(a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such [deadly] force to protect himself." *Commonwealth* v. *Martin*, 369 Mass. 640, 649 (1976). The absolute inapplicability of this law to the circumstances of this case is obvious.