COMMONWEALTH vs. MANUEL JAMES BARBOSA.

Plymouth. February 10, 2012. - August 6, 2012.

Present: IRELAND, C.J., CORDY, BOTSFORD, DUFFLY, & LENK, JJ.

*Homicide. Firearms. Evidence,* Firearm, Relevancy and materiality, Hearsay, Prior consistent statement, Identification, Consciousness of guilt. *Practice, Criminal,* Hearsay, Identification of defendant in courtroom, Warrant, Affidavit, Instructions to jury, Capital case. *Search and Seizure,* Warrant, Affidavit. *Identification. Self-Defense. Witness,* Credibility.

At a murder trial, no prejudice was caused by the erroneous admission, to show the defendant's access to or familiarity with firearms, of ammunition and a magazine that were discovered in the defendant's apartment but which could not have been used in conjunction with the murder weapon, as well as testimony regarding security measures found in the apartment, where, given the quantity and quality of properly admitted evidence of guilt, and the scant attention given to the ammunition and security measures evidence, the error had at most a very slight effect on the jury. [121-127]

At a murder trial, no prejudice was caused by the erroneous admission of hearsay testimony by a State trooper that corroborated testimony by a witness about the defendant's attempt prior to trial to pay the witness to recant his testimony, and about a subsequent meeting between the witness and a defense investigator that was witnessed by an undercover officer, where the admitted testimony was cumulative and was presented in an objective, unprovocative manner. [127-130]

At a murder trial, there was no error in the admission of testimony by a witness who identified the defendant in court that he also identified the defendant in a photographic array and before a grand jury, or in the Commonwealth's eliciting from the witness the differences between his initial statements denying seeing the shooter and his eventual identification of the defendant and seeking an explanation for the inconsistencies. [130-132]

There was no error in the denial by a Superior Court judge of a criminal defendant's pretrial motion to suppress evidence, challenging the sufficiency of a search warrant affidavit, where each informant provided detailed accounts of recent events in a manner consistent with firsthand observation, thus satisfying the basis of knowledge requirement; where the unnamed informants' detailed statements corroborating each other in significant, detailed respects satisfied the veracity requirement; and where, taken together, the statements by the defendant and the three informants provided probable cause to issue the warrant. [132-135]

This court declined to consider a criminal defendant's challenge to the sufficiency of the evidence on his conviction of murder in the first degree on a theory of extreme atrocity or cruelty, where the jury also convicted him on the theory of deliberate premeditation. [135]

This court concluded that, at the trial of an indictment charging murder in the first degree, the evidence did not warrant a jury instruction on manslaughter on the theory of excessive force in defense of another [135-136], or an instruction on voluntary manslaughter, where the defendant's having left the scene of the crime, in conjunction with the passage of time, objectively indicated, as a matter of law, that he had "cooled off" [136-137].

INDICTMENTS found and returned in the Superior Court Department on March 27, 2009.

A pretrial motion to suppress evidence was heard by *Robert C. Cosgrove*, J., and the cases were tried before *Jeffrey A. Locke*, J.

*Joseph A. Hanofee* for the defendant.

*Mary Lee*, Assistant District Attorney, for the Commonwealth.

CORDY, J. Shortly after midnight on December 26, 2008, an individual fired a single shot from a .38 caliber firearm into a dark and crowded party in Brockton. The bullet struck the victim, Hercules Dossantos, in the back, and he was pronounced dead three hours later. Three attendees identified the defendant as the shooter, and he was subsequently indicted for murder in the first degree, G. L. c. 265, § 1, and for four firearms offenses: carrying a firearm without a license in violation of G. L. c. 269, § 10 (*a*); carrying a loaded firearm in violation of G. L. c. 269, § 10 (*n*); possession of ammunition without a firearm identification card in violation of G. L. c. 269, § 10 (*b*); and discharging a firearm within 500 feet of a building in violation of G. L. c. 269, § 12E. A jury found the defendant guilty on all charges, including murder in the first degree on theories of both premeditation and extreme atrocity or cruelty.[1]

The defendant raises numerous claims of error, principally that the judge erred by permitting the prosecution to introduce a nine millimeter round of ammunition and a magazine clip that were found in the defendant's apartment. Although the judge instructed the jury that these items could be considered only to show the defendant's familiarity with or access to firearms, the defendant argues that any probative value this evidence might have had was substantially outweighed by its prejudicial effect,

---

[1]At sentencing, the judge dismissed the indictment charging possession of ammunition without a firearm identification card as duplicative of the indictment charging possession of a loaded firearm.

where the seized ammunition and magazine could not have been used in conjunction with the .38 caliber murder weapon and the items were found in a common area of the apartment that was not specifically connected to the defendant. In the same vein, the defendant claims that the judge improperly permitted the prosecution to introduce evidence of security measures found in the defendant's apartment consisting of three pit bull dogs, a security camera trained on the apartment's front door and connected to a television in the defendant's bedroom, and a police scanner tuned to the Brockton police channel.

The defendant further claims that the judge incorrectly permitted a State trooper to testify to the substance of a conversation between the defendant and the key identifying witness, Jose DeMiranda, in which the defendant offered to pay DeMiranda to leave the country in exchange for recanting his testimony. The trooper's recollections of DeMiranda's statements were hearsay, and the judge admitted them solely as prior consistent statements that bore on DeMiranda's credibility. The defendant further argues that the State trooper should not have been permitted to testify about DeMiranda's refusal to sign an affidavit recanting his testimony, which was observed by a different police officer acting undercover, because the testimony could have inflamed the jury by suggesting that the defendant wrongfully pressured the witness.

We conclude that although the judge erred in the above evidentiary rulings, they were not prejudicial to the defendant. The Commonwealth's case was strong. Three eyewitnesses identified the defendant as the shooter, and additional eyewitnesses corroborated their accounts of the events at the party. The defendant's telephone records corroborated DeMiranda's account of the defendant's actions after leaving the party. The defendant's attempt to pay DeMiranda to leave the country demonstrated the defendant's consciousness of guilt. Although each of the three identifying eyewitnesses was impeached with prior inconsistent statements, the jury were entitled to credit their statements at trial, which were largely consistent with each other. Against this substantial evidence, the admission of evidence on the collateral matters to which the defendant objects (and which was appropriately accompanied by limiting instructions)

could not have appreciably swayed the jury. See *Commonwealth v. Martinez*, 431 Mass. 168, 174-175 (2000); *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), and cases cited.

We reject the defendant's remaining challenges, and we decline to exercise our extraordinary power under G. L. c. 278, § 33E, to reverse the defendant's convictions and order a new trial. We therefore affirm.

1. *Background.* We recite the facts the jury could have found, reserving certain details for later discussion. On December 25, 2008, Alina Miranda and Maria Andrade hosted a party in their third-floor apartment at 88 Weston Street in Brockton. The apartment was accessed by two staircases. A front staircase opened into a bedroom, and a rear staircase opened into the kitchen. During the party, a "disc jockey" played music, the lights were off in the living room, and a "disco ball" was flashing.

Approximately fifteen to twenty young adults attended the party. Many of the partygoers were Cape Verdean and referred to each other by nicknames. The defendant, also known as "Fish," arrived with three relatives, including his stepbrother Admilson "Fausto" Rodriguez. The defendant was godfather to Maria Andrade's infant daughter. The defendant was wearing a black leather jacket with patches of various colors. Nobody else at the party wore a similar jacket. His long hair was tied back in a ponytail.

Dossantos, the victim, arrived with five friends, including his brother, Paulo Gomes, and his friend, Sandy Lopes. Lopes's former girl friend was also at the party with their infant daughter. Lopes, who came to the party inebriated, started to dance with his infant daughter in the living room and threw her in the air. The baby hit her head on the ceiling and fell to the floor. Miranda ran to the screaming baby and attempted to pick her up. Lopes grabbed the baby's feet. Miranda told Lopes that she wanted to take the baby into the bedroom to make sure that she was not hurt. Lopes refused to release the baby, stating that he was the father and he would take care of her.

The defendant intervened and grabbed Lopes by the throat. As the defendant attempted to seize the baby, Lopes punched the defendant in the eye. The defendant eventually wrested the

baby away and handed her to Miranda. He walked away, angry. Fausto then entered the fight. Fausto was on top of Lopes, beating him. Many of the partygoers, including the victim, unsuccessfully tried to stop the fight. The defendant brandished a silver gun in his left hand; people shouted "stop." The defendant then left the apartment by the back stairs.

Jose DeMiranda also left the apartment while the fight was ongoing. He knew both Fausto and Lopes and did not want to get involved in the fight. Outside, DeMiranda saw the defendant behind the house. The defendant asked DeMiranda whether the fight was still ongoing, and DeMiranda responded in the affirmative. The defendant then climbed back up the rear staircase toward the kitchen. DeMiranda followed. Four to five minutes had elapsed since the altercation over the baby. When the defendant reached the landing at the top of the staircase, he raised the gun in his left hand, pointed toward the living room, and fired one shot. He then ran down the stairs, past DeMiranda, and outside. DeMiranda reached the apartment's kitchen a couple of seconds later and quickly followed the defendant down the stairs.

The defendant made a telephone call and told someone to pick him up. The defendant's telephone records showed that he had called a number that belonged to the mother of Nicholas Loring. Loring lived in the defendant's apartment and was the defendant's sister's boy friend. Two men arrived in a vehicle and picked up the defendant and DeMiranda.

Back at the party, Dossantos staggered to a bedroom, where he complained that his back was burning. He fell to the ground and cycled in and out of consciousness until the police arrived fifteen minutes later. Dossantos was taken to a hospital, where he was pronounced dead at 3 A.M. The single gunshot had severed two major blood vessels. Testing of gunshot residue on Dossantos's jacket showed that the distance between the muzzle of the firearm and the jacket was three feet or less.

A spent casing of .38 caliber ammunition for an automatic weapon was found on the kitchen floor. The bullet taken from Dossantos's body during the autopsy was consistent with .38 caliber automatic weapons.

The Brockton police thereafter obtained a search warrant for

the defendant's apartment. The defendant lived in a two-bedroom apartment with his girl friend; his sister, Loring, and their child; and another man who slept on the couch. While executing the warrant, the police found one round of nine millimeter ammunition under the stove and a magazine for a nine millimeter firearm inside a man's shoe in a storage closet. No attempt was made to match the shoe with any of the occupants of the apartment. Inside the defendant's bedroom, police found a large television connected to a security camera displaying the front door of the building and a police scanner tuned to the channel used by the Brockton police. Three pit bull puppies were found in the apartment.

2. *Admission of ammunition, magazine, and security measures.* The defendant argues that the nine millimeter ammunition, the magazine, and the security measures were improperly admitted in evidence. We agree, but conclude that the error did not cause prejudice to the defendant.

After conducting a voir dire on the compatibility of the ammunition and magazine with .38 caliber weaponry, the judge concluded that the ammunition and magazine could not have been used in conjunction with the murder weapon. Consequently, the judge ruled that the ammunition and magazine would not be admissible on the theory that they could have been used in connection with the crime. However, the judge found that this evidence was potentially relevant to show the defendant's "access to or familiarity with firearms."

The judge was initially reluctant to admit the evidence for this purpose because of the tenuous link between the evidence and the defendant. Nevertheless, the judge credited the prosecutor's argument that the defendant's possession of the security measures made it more likely that the ammunition and magazine (also presumably used for security) belonged to him. Accordingly, the judge permitted the introduction of the ammunition, magazine, and security measures over the defendant's objection. The judge provided the jury with a limiting instruction during his final charge regarding the ammunition and magazine and round: "You may consider this as some evidence showing the defendant's familiarity with or access to firearms or firearms ammunition, but only if you first conclude that the

defendant knowingly had possession, custody, or control over that nine millimeter evidence. If you're not satisfied the defendant had knowing possession, custody, or control over that ammunition and the magazine, then you should not consider that evidence in any way." The judge did not specifically comment on how the jury should consider the security equipment.

A weapon that could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime. See *Commonwealth* v. *Williams*, 456 Mass. 857, 871 & n.11 (2010); *Commonwealth* v. *Ashman*, 430 Mass. 736, 744 (2000); *Commonwealth* v. *James*, 424 Mass. 770, 779-780 (1997); *Commonwealth* v. *Toro*, 395 Mass. 354, 356-357 (1985), and cases cited. Such evidence is relevant for demonstrating that the defendant had the "means of committing the crime." *Commonwealth* v. *Ashman, supra.*

Where a weapon definitively could not have been used in the commission of the crime, we have generally cautioned against admission of evidence related to it. Our clearest statement on this scenario is in *Commonwealth* v. *Toro, supra.* In that case, the victim had been killed by a .38 caliber bullet. *Id.* at 355. When the police apprehended the defendant, they seized a cache of weapons, including two .32 caliber revolvers, a holster for a .45 caliber clip, and numerous rounds of ammunition for weapons other than a .38 caliber handgun. *Id.* We held that the admission of evidence related to calibers other than .38 could not be justified "on the traditional ground of relevancy." *Id.* at 357. Rejecting the argument that the cache was "arguably relevant in that it tended to show that he was acquainted with weapons and was able to use them," we observed that "[c]ases here and elsewhere have not, however, viewed the tenuous relevancy of a person's general acquaintance with weapons as outweighing the likelihood that such evidence will have an impact on the jury unfair to a defendant." *Id.* at 358.

Despite the strong language in *Commonwealth* v. *Toro, supra,* we have not unconditionally disapproved of the admission of weapons-related evidence unconnected to the commission of a crime. See *Commonwealth* v. *Ridge*, 455 Mass. 307, 309, 322-323 (2009) (no error in admitting evidence showing defendant's

access to and familiarity with firearms allegedly dissimilar to murder weapon, when appropriate limiting instruction given); *Commonwealth* v. *Marquetty*, 416 Mass. 445, 448 (1993) (no substantial likelihood of miscarriage of justice in admitting testimony that large hunting knife, not alleged to be murder weapon, was found in defendant's vehicle); *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1991) (no abuse of discretion in admitting testimony by witness of seeing defendant with gun nearly identical to murder weapon to show defendant possessed means to accomplish crime). Nevertheless, two factors in this case strongly counsel against admission of the nine millimeter evidence. Forensic evidence established that the nine millimeter weaponry could not practically have been used in the commission of this crime. In the aforementioned cases, the dissimilarities between the admitted evidence regarding weapons and the nature of the murder weapons were either asserted without proof or based on an eyewitness's memory of the weapon's color. See *Commonwealth* v. *Ridge, supra* at 322; *Commonwealth* v. *Marquetty, supra*; *Commonwealth* v. *Otsuki, supra* at 235 n.12. Second, the proof that the defendant personally possessed the nine millimeter evidence was speculative, even considering the defendant's ownership of other security measures. We have never approved the admission of weapons-related evidence unconnected to the commission of a crime on such tenuous grounds.[2]

The judge should not have admitted the nine millimeter evidence, because its relevance was substantially outweighed by the danger of unfair prejudice to the defendant. See *Commonwealth* v. *Richardson*, 59 Mass. App. Ct. 94, 102-103 (2003); Mass. G. Evid. § 403 (2012). Cf. *Commonwealth* v. *Toro, supra*

---

[2]The Commonwealth unconvincingly analogizes this case to cases in which security systems demonstrated constructive possession of narcotics. See *Commonwealth* v. *Montalvo*, 76 Mass. App. Ct. 319, 324 (2010); *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 619-620 (1990), *S.C.*, 410 Mass. 1005 (1991). In each of those cases, the defendant argued that he was merely present in an apartment and did not possess any of its contents. Barricades and other security measures, protecting the entirety of the apartments, belied those claims. See *Commonwealth* v. *Montalvo, supra*; *Commonwealth* v. *Arias, supra.* Here, the security systems were concentrated in the defendant's personal space and demonstrated only that he possessed items within his room — a point he does not dispute.

at 356. The admission of testimony about the security camera, police scanner, and pit bulls was likewise erroneous. The defendant's choice to safeguard his possessions, using entirely legal methods, was not relevant to his alleged commission of this crime. See *Commonwealth* v. *Simpson,* 434 Mass. 570, 583 (2001) (police scanner not probative of issues at trial and should not have been admitted).[3]

Although this evidence should not have been admitted, our review of the entire trial leads us to conclude that it did not prejudice the defendant. An error is not prejudicial only "if we are sure that the error did not influence the jury, or had but very slight effect . . . . But if one cannot say . . . without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Commonwealth* v. *Graham,* 431 Mass. 282, 288, cert. denied, 531 U.S. 1020 (2000), quoting *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994). Here, based on "the quantity and quality of properly admitted evidence of guilt," *Commonwealth* v. *McLaughlin,* 79 Mass. App. Ct. 670, 680 (2011), and on the scant attention given to the nine millimeter and security measures evidence at trial, see *Commonwealth* v. *Marquetty, supra* at 448-449, we conclude that the error had at most a "very slight effect" on the jury. *Commonwealth* v. *Flebotte, supra,* quoting *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445 (1983). See also *Commonwealth* v. *Martinez,* 431 Mass. 168, 175 (2000).

Three witnesses identified the defendant as the shooter from different vantage points: DeMiranda, following the defendant from the staircase; Jelissa DeLeon, observing the defendant's face directly from the kitchen; and Jonathan Andrade, recognizing the arm of the shooter's distinctive jacket. Each of these three witnesses picked out the defendant in a photographic array.

---

[3] The Commonwealth also suggests, on appeal, that the police scanner and security system were admissible to show the defendant's consciousness of guilt. We generally decline to consider arguments raised for the first time on appeal. See, e.g., *Currier* v. *National Bd. of Med. Examiners, ante* 1, 21 n.21 (2012). The Commonwealth has produced no evidence suggesting that these security systems had been recently installed. We need not dwell on the matter, however, because we conclude that their admission was not prejudicial in light of the other evidence of the defendant's guilt admitted at trial.

Additional witnesses who attended the party corroborated the central features of these identifying witness's accounts. For example, the identifying witnesses testified that the defendant, known to them as "Fish," wore a distinctive black leather jacket to the party. Anthomesha Gomes, Joao Alves, and Alina Miranda testified to the same. These three witnesses also testified that they observed the defendant fighting with Lopes but did not see him during the aftermath of the shooting. Paulo Gomes could not identify the shooter, but he observed, in concert with the identifying witnesses, that the shooter held the gun in his left hand.

In addition to the percipient witnesses, the Commonwealth called eleven witnesses who testified about the crime scene, forensics, and telephone records. The forensic evidence aligned with the testimony of the percipient witnesses. The defendant's telephone records evidenced a telephone call to a number associated with Nicholas Loring shortly after the shooting, corroborating DeMiranda's version of the events following the shooting.

Although the evidence against the defendant was extensive, the discussion of the evidence found in the defendant's apartment was brief. Two police officers testified about their search of the defendant's apartment. The testimony and cross-examination of Detective John Lonergan of the Brockton police department, who found the ammunition and magazine, took up only ten pages in the transcript. The testimony of State Trooper Elvin Morales, who found the security camera, police scanner, and pit bulls, spanned fifteen pages in the transcript and focused mostly on items of clothing found in the apartment. Ten other witnesses testified on the same day as Detective Lonergan and Trooper Morales.

The items found in the defendant's apartment were barely discussed in the closing arguments. The defendant's attorney made no mention of them. The prosecutor addressed them in one paragraph of a fifteen-page argument. She recounted that these items were found and stated that they were relevant insofar as they "show[ed] the defendant's ability to possess, and his familiarity with ammunition." Cf. *Commonwealth* v. *Marquetty*, *supra* at 448 (no substantial risk of miscarriage of justice when

weapon alluded to only briefly during testimony). At no point did the prosecutor intimate that the defendant illegally possessed the security measures, or that they were used for an illegal purpose. Cf. *Commonwealth* v. *Anderson*, 448 Mass. 548, 560 (2007) (testimony about skill with knives not overly prejudicial because such ability "not a trait a jury necessarily would view negatively"). Shortly thereafter, the judge gave a limiting instruction, noted above, requiring the jury to consider the nine millimeter evidence only to show the defendant's "familiarity with or access to firearms or firearms ammunition," and only if they first found that the defendant possessed the items. See *Commonwealth* v. *Ridge*, 455 Mass. 307, 323 (2009) (jury presumed to follow limiting instruction on this issue). The jury asked no questions about these items. Contrast *Commonwealth* v. *Richardson*, 59 Mass. App. Ct. 94, 102 n.9 (2003) (jury asked to see improperly admitted weapon).

The defendant argues that the prejudicial effect of the erroneous admissions was heightened because the prosecution's witnesses lacked credibility. Each of the three eyewitnesses who identified the defendant had previously made statements — in DeMiranda's case, multiple statements — to the police in which they had denied seeing the shooter. The witnesses had explained their initial reticence by saying that they were "afraid" or "just . . . didn't want to say [anything]." Andrade even refused to appear in court willingly. Once on the stand, he could not recall his identification of the defendant, and the prosecution read his grand jury testimony into the record. DeMiranda had implicated himself in a conversation with Jelissa DeLeon the day after the homicide, during which he told her, "We got the wrong dude." DeMiranda was also impeached at length for bias related to the favorable disposition of criminal charges and the nonenforcement of a deportation order during the pendency of the present case.

Although these inconsistencies might have raised some doubts, we are certain, based on the totality of the evidence and the inferences that might reasonably be drawn therefrom, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), that the jury would not have resolved these doubts on the basis of the material found at the defendant's home. As discussed above,

ample evidence reinforced the testimony of the three identifying witnesses. This was not a situation in which the defendant's word was pitted against that of a single witness. Contrast *Commonwealth* v. *Kowalski*, 33 Mass. App. Ct. 49, 51 (1992) (admission of extraneous character evidence deemed prejudicial where single accuser alleged rape and defendant argued consent). Any consideration of the defendant's possessions would have had no more than a "very slight effect" on the deliberations. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

3. *Hearsay statements by a police officer bolstering statements by another witness.* The defendant next objects to the admission of hearsay testimony by State Trooper Robert Klimas that corroborated testimony by DeMiranda about the defendant's attempt to pay DeMiranda to retract his testimony and about a subsequent meeting between DeMiranda and a defense investigator that was witnessed by an undercover officer. We agree that this testimony should not have been admitted, but find that the error caused the defendant no prejudice because the admitted testimony was cumulative and was presented in an objective, unprovocative manner.

DeMiranda testified that the defendant contacted him and offered to pay him to return to Cape Verde if he would say that he did not know the identity of the shooter.[4] Thereafter, in September, 2009, DeMiranda was in contact with the defendant's investigator, and the investigator requested that DeMiranda sign an affidavit recanting his prior statements. Before meeting the investigator, DeMiranda contacted the State police. He arranged that an undercover officer would accompany DeMiranda to the meeting.[5] At the meeting, which took place in October, 2009, DeMiranda refused to sign the affidavit. The investigator did not press DeMiranda and discarded the affidavit.

On cross-examination, the defendant accused DeMiranda of

---

[4]The judge issued a limiting instruction, stating that the jury should consider this evidence only for evaluating the defendant's consciousness of guilt.

[5]The defendant objected, alleging that permitting DeMiranda to testify that the police were monitoring the conversation implied that the defendant was doing something improper. The judge ascertained that the Commonwealth had determined the actions of the private investigator were not improper, and advised the Commonwealth that he did not see any need to "inquire too much further as to the presence of . . . a trooper undercover."

implicating the defendant as the shooter only when he was in the presence of the police because he felt that he needed to cooperate in order to avoid an unfavorable disposition of his pending criminal and immigration cases.[6] Defense counsel did not challenge DeMiranda's testimony regarding the defendant contacting him and offering to pay for him to leave the country.

Later in the trial, the judge conducted a bench conference concerning the admissibility of recordings and translated transcripts of telephone calls between the defendant and DeMiranda. The judge excluded the recordings and transcripts, but ruled that "the Commonwealth may elicit testimony from witnesses, perhaps Trooper Klimas, if indeed he was involved in the October, 2009, disclosure by Mr. DeMiranda, that he was asked to sign an affidavit and in general terms the circumstances surrounding that."

Trooper Klimas testified that DeMiranda contacted him in October, 2009, and informed him that both the defendant and a defense investigator were attempting to get him to "change his story." The defendant objected that the testimony was hearsay. The judge ruled that the statements were admissible as they related to a claim of recent contrivance or fabrication by DeMiranda, and he issued a limiting instruction to that effect.

Trooper Klimas then elaborated that, according to DeMiranda, the defendant had offered to buy DeMiranda a ticket to Cape Verde in exchange for "chang[ing] his story," and that a defense investigator had approached DeMiranda and asked him to sign an affidavit. DeMiranda set up the meeting with the defense investigator in the presence of an undercover officer (not Trooper Klimas); other troopers were on surveillance monitoring what transpired. DeMiranda refused to sign the

---

[6]Defense counsel returned to this theme during his redirect examination of the investigator:

> DEFENSE COUNSEL: "So . . . when [DeMiranda] was with you without the presence of the police, he said he didn't see it, correct?"
>
> THE WITNESS: "Correct."
>
> DEFENSE COUNSEL: "And then when he was in the physical presence of the police, he said he did see it, yes?"
>
> THE WITNESS: "Yes."

Defense counsel subsequently reviewed this exchange during closing argument.

affidavit. DeMiranda appeared "very nervous" at the time. The undercover officer did not testify, and Trooper Klimas did not explain the source of his knowledge of what transpired during this encounter.

The defense investigator testified consistently with the accounts of DeMiranda and Trooper Klimas regarding his meeting with DeMiranda and DeMiranda's refusal to sign the recanting affidavit. He also testified that DeMiranda never indicated that he was being pressured, threatened, or coerced, nor did he ever appear paranoid or nervous.

Trooper Klimas's hearsay testimony was not admissible as a prior consistent statement. "A witness's prior statement that is consistent with that witness's trial testimony is usually inadmissible." *Commonwealth* v. *Novo*, 449 Mass. 84, 93 (2007), quoting *Commonwealth* v. *Rivera*, 430 Mass. 91, 99 (1999). "[W]hen trial testimony is impeached by a claim that the witness has recently fabricated her account, a prior consistent statement made before the witness had incentive to fabricate may be admitted for the limited purpose of rebutting the claim of recent fabrication." *Commonwealth* v. *Novo*, *supra*, quoting *Commonwealth* v. *Rivera*, *supra* at 99-100. See Mass. G. Evid. § 613(b) (2012). Here, however, the defendant had not claimed that DeMiranda had fabricated the conversations between himself, the defendant, and the investigator. Nor was Trooper Klimas's testimony justified by any other hearsay exception.

Although Trooper Klimas's testimony should not have been admitted, the admission caused the defendant no prejudice. The testimony was cumulative, insofar as it was virtually identical to that provided by DeMiranda and by the defense investigator. See *Commonwealth* v. *Avila*, 454 Mass. 744, 758-759 (2009) (although not dispositive, cumulative nature of prior consistent testimony indicates lack of prejudice); *Commonwealth* v. *Thomas*, 429 Mass. 146, 159-160 (1999), and cases cited. See also *Commonwealth* v. *Bruce*, 61 Mass. App. Ct. 474, 482-483 (2004). Although DeMiranda was a crucial witness, insofar as he was the only one to observe the defendant immediately before and after the shooting, testimony of other witnesses substantially corroborated his account, as discussed above. See *Commonwealth*

v. *Avila*, *supra* at 759 (prior consistent statements of "critical witness" not prejudicial where "independently obtained evidence presented at trial . . . offered repeated corroboration of the chronology of events that [he] laid out"). Moreover, defense counsel exploited Trooper Klimas's testimony to challenge DeMiranda's credibility, arguing that DeMiranda implicated the defendant only when the police were watching him. Cf. *Commonwealth* v. *McCoy*, 456 Mass. 838, 852 (2010) (any error in admitting testimony "was overcome by the benefits received in cross-examination").

Contrary to the defendant's claim, the judge ensured that Trooper Klimas's testimony would neither glamorize the police investigation nor create the inference that the defense team had engaged in wrongdoing. In response to a prompt from the judge, DeMiranda testified during his direct examination that the investigator had not placed him under any duress to sign the affidavit. The judge also sustained the defendant's objection when Trooper Klimas characterized the affidavit as containing a "false story." To the extent that the judge advised the prosecutor not to refer to an undercover police officer, the defendant reopened the door by highlighting the differences in DeMiranda's stories depending on whether or not he was in the presence of the police. In sum, the "improperly admitted hearsay did not prejudice the defendant [in light of it being] merely cumulative of properly admitted evidence" and "in light of the other evidence of his guilt." *Commonwealth* v. *Wilson*, 427 Mass. 336, 348 (1998).

4. *Admissibility of prior statements of identification.* The defendant next challenges the admission of DeMiranda's testimony that he identified the defendant in a photographic array and before a grand jury.[7] The defendant argues that, because DeMiranda also identified the defendant in court, the prior identifications were cumulative and improperly bolstered DeMiranda's in-court testimony. We conclude that there was no error.

A witness's pretrial identification is admissible for substantive purposes, even in the absence of an in-court identification, provided the identifying witness testifies at trial and is subject to cross-examination. *Commonwealth* v. *Walker*, 460 Mass. 590,

---

[7]Detective Dominic Persampieri of the Brockton police department testified that he administered the photographic array to DeMiranda.

607-608 (2011), citing *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 441-442 (2005). See Mass. G. Evid., *supra* at § 801(d)(1)(C). "Prior identification evidence is of substantive value . . . because it has occurred under nonsuggestive circumstances and closer in time to the offense." *Commonwealth* v. *Cong Duc Le*, *supra* at 441.

Although pretrial identifications are commonly admitted when the witness does not identify the defendant in court, see, e.g., *id.* at 434-435, they are equally admissible when the witness maintains his identification in court. See *Commonwealth* v. *Walker*, *supra* at 607 (pretrial identification admissible "even where identifying witness denies or does not remember having made [the] identification"). We have repeatedly upheld the admission of testimony in which a witness identifies a defendant in court and also recalls a pretrial identification. See, e.g., *Commonwealth* v. *Sylvia*, 456 Mass. 182, 184 n.5 (2010); *Commonwealth* v. *Thomas*, 429 Mass. 146, 159 (1999); *Commonwealth* v. *Schand*, 420 Mass. 783, 795-796 (1995); *Commonwealth* v. *Delong*, 60 Mass. App. Ct. 528, 532 (2004). Once an identifying witness makes an in-court identification and acknowledges a pretrial identification, a police officer's testimony concerning the identifying witness's pretrial identification is admissible both to corroborate the in-court identification and as substantive evidence of the defendant's guilt. *Commonwealth* v. *Martinez*, 431 Mass. 168, 175 (2000). *Commonwealth* v. *Schand*, *supra* at 796. See K.B. Smith, Criminal Practice and Procedure § 7.49 (3d ed. 2007).

We decline to follow the defendant's invitation to limit the substantive admission of pretrial identifications to cases in which the identifying witness had no known incentive to fabricate when the identification was made. We rejected a similar argument in *Commonwealth* v. *Adams*, 458 Mass. 766, 773 (2011). In that case, the defendant argued that only the first version of an extrajudicial identification should have been admitted by analogizing to how statements of first complaint are treated in sexual abuse cases. We found the analogy inapposite because, unlike multiple complaint testimony, pretrial identifications "are not hearsay, and are admissible for substantive purposes." *Id.* The jury were fully capable of evaluating which statement to

accept. *Id.* at 771. Here, too, although DeMiranda's credibility even at the initial identification was called into question by his pending immigration and criminal matters and his prior statements implicating himself and denying having seen the shooter, those matters were relevant to the jury's exclusive province to determine the credibility of the witness and the weight of his identification, not to its admissibility.[8]

We likewise find no error in the Commonwealth's eliciting from DeMiranda the differences between his initial statements denying seeing the shooter and his eventual identification of the defendant and seeking an explanation for the inconsistencies. The Commonwealth is entitled to question its own witness about inconsistent statements. *Commonwealth* v. *Scott*, 408 Mass. 811, 824 n.14 (1990). See Mass. G. Evid., *supra* at § 613(a)(1). The defendant cross-examined DeMiranda extensively about these statements, including those that were consistent with the trial testimony. He cannot now claim that their admission was error. See *Commonwealth* v. *Tevlin*, 433 Mass. 305, 318 (2001) ("theory on which a case is tried will not be ignored on appeal").

5. *Sufficiency of the search warrant affidavit.* The defendant next argues that the motion judge erred in denying his motion to suppress evidence obtained during a search of his residence because the search warrant application failed to satisfy either prong of the *Aguilar-Spinelli* test. See *Spinelli* v. *United States*, 393 U.S. 410 (1969); *Aguilar* v. *Texas*, 378 U.S. 108 (1964); *Commonwealth* v. *Upton*, 394 Mass. 363, 374-375 (1985).

In addition to the nine millimeter ammunition and magazine and the security measures, discussed in part 2, *supra*, the police also recovered items of the defendant's clothing, including a jacket that the defendant claimed he was wearing on the night of the party. None of the witnesses who had seen the defendant at the party recognized this jacket, and tests for gunshot residue on the jacket were negative. During closing argument, the prosecutor argued that the defendant lied to the police about which jacket he had been wearing because he knew that there

---

[8]The pretrial identifications of the defendant made by Jelissa Deleon and Jonathan Andrade were admissible for the same reason. Although both were cross-examined for their inability to perceive the shooter clearly, that challenge went to the weight of the identifications, not their admissibility.

might be forensic evidence on the other jacket. Although the items obtained during the execution of the search warrant may have caused some prejudice to the defendant, we conclude that there was no error.

Sufficiency of a search warrant application is determined by examining the "four corners of the affidavit." *Commonwealth* v. *Cavitt*, 460 Mass. 617, 626 (2011), quoting *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003). In order to satisfy the *Aguilar-Spinelli* test, an affidavit relying on confidential informants must reflect the basis of knowledge of the source of the information, and the underlying circumstances establishing the information's reliability. *Commonwealth* v. *Lopes*, 455 Mass. 147, 155-156 (2009).

The police officer's affidavit contained information provided by three confidential informants, each of whom reported being at the party where the shooting occurred. Informant no. 1 observed two Cape Verdean men known as "Fausto" and "Fish" at the party. Informant no. 1 described "Fish" as dark-skinned and wearing black jeans, a red shirt, and a black hooded sweatshirt. Informant no. 1 also witnessed the victim arrive with a Cape Verdean man known as "Sandy," who shortly thereafter engaged in fisticuffs with "Fausto" in the living room.

Informant no. 2 reported that during the fight, a Cape Verdean man, approximately five feet, six inches tall and wearing a red T-shirt, emerged from the rear staircase with a silver semiautomatic handgun in his left hand and fired one shot in the direction of the living room. Informant no. 2 described hearing the gunshot and seeing the muzzle flash from the area of the back staircase, but did not see the shooter's face.

Informant no. 3 also recognized "Sandy" and "Fausto" as the individuals fighting in the living room. Informant no. 3 also observed "Fish" standing by the back stairway, during which time he pulled a silver semiautomatic handgun from his jacket pocket, held the gun in his left hand, and gestured with it toward the fight. Informant no. 3 then traveled down the rear stairs to a deck, where soon thereafter "Fish" arrived and lingered briefly before running back up the stairs with his hands in his jacket pockets. Informant no. 3 followed "Fish" up the stairs, and on

reaching the second-floor landing, heard a gunshot emanating from the third-floor doorway.

The affidavit also included statements of the defendant, who, after being advised of his Miranda rights, confirmed that he was at the party and that he was known to others as "Fish." The defendant stated that while on the rear deck, he was informed of the fight, and then ran up the rear stairs to help. Just before reaching the door to the apartment, he heard a gunshot and promptly returned home.

The defendant contends that the information in the affidavit was insufficient to establish a basis of knowledge that would support probable cause. To the contrary, "[f]irst-hand receipt of information through personal observation satisfies the basis of knowledge prong of *Aguilar-Spinelli.*" *Commonwealth* v. *Allen,* 406 Mass. 575, 578 (1990). Here, each informant provided detailed accounts of recent events in a manner consistent with first-hand observation, thus satisfying the basis of knowledge prong. See *Commonwealth* v. *Alfonso A.,* 438 Mass. 372, 374 (2003).

The affidavit also satisfied the veracity prong. In *Commonwealth* v. *Nowells,* 390 Mass. 621, 627 (1983), we recognized that "unnamed informants' detailed statements corroborating each other in significant, detailed respects, particularly as to criminal conduct . . . could alone support a finding of probable cause by establishing the veracity of the informants." This is such a case. Informants no. 1 and no. 3 each placed "Fish" at the party. Informant no. 1's description of "Fish" matched Informant no. 2's description of the shooter. Informant no. 2 stated that the shooter was positioned at the rear staircase, holding a silver semiautomatic handgun in his left hand, which was corroborated by Informant no. 3's observations that "Fish" held a silver semiautomatic handgun in his left hand and that the shot came from the third-floor doorway by the rear staircase just after "Fish" ascended that staircase.

The defendant also corroborated the informants' accounts. The defendant informed the police that he was known as "Fish," that he was at the party during the fight, that he ran up the rear stairs just prior to the shooting, and that he immediately returned home after the shooting. Taken together, the statements by the

defendant and the three informants provided probable cause to issue a search warrant for evidence relating to the homicide that might be found in the defendant's residence.

6. *Sufficiency of the evidence on extreme atrocity or cruelty.* The defendant argues that there was insufficient evidence to charge the jury on the theory of extreme atrocity or cruelty. Because the jury also convicted the defendant based on the theory of deliberate premeditation, we need not address this objection. *Commonwealth* v. *Chipman,* 418 Mass. 262, 270 n.5 (1994), and cases cited.

7. *Failure to instruct on manslaughter.* The defendant argues that the judge should have instructed the jury on manslaughter, based on the theories of excessive force in defense of another and reasonable provocation. No such instruction was requested, and the defendant did not object. Nor has the defendant filed a motion for a new trial to determine whether trial counsel had a strategic reason for not requesting this instruction. It may well be that, because the primary defense was misidentification, it would have been "tactically awkward" for counsel to press an alternative theory of manslaughter. *Commonwealth* v. *Donlan,* 436 Mass. 329, 333-334 (2002). In any case, even viewed in the light most favorable to the defendant, the facts did not warrant an instruction on either theory.

a. *Excessive force in defense of another.* A defendant is entitled to an instruction on self-defense "if the evidence, viewed in the light most favorable to him, is sufficient to raise the issue." *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980). Such an instruction is warranted when supported by the evidence, even when, as here, the defendant did not request it. *Commonwealth* v. *Deagle,* 10 Mass. App. Ct. 748, 751 (1980). The defendant argues that his videotaped statement to police, which was admitted in evidence, warranted the conclusion that the defendant believed that his stepbrother Fausto was "getting jumped," and that he intervened in Fausto's defense.

"An actor is justified in using force against another if to protect a third person when (a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person

would be justified in using such force to protect himself." *Commonwealth* v. *Martin*, 369 Mass. 640, 649 (1976). When a defendant uses excessive force in defense of another, the crime may be mitigated from murder to manslaughter. *Commonwealth* v. *Young*, 461 Mass. 198, 212 (2012). *Commonwealth* v. *Haith*, 452 Mass. 409, 415 (2008).

"[T]he right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault." *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978). A person is entitled to act in self-defense only if he " 'availed himself of all proper means to avoid physical combat' by retreating or attempting to retreat." *Commonwealth* v. *Espada*, 450 Mass 687, 693 (2008), quoting *Commonwealth* v. *Harrington*, *supra*. Similarly, a third party is not entitled to use force in defense of another if the other person intervened in a fight by his own volition. *Commonwealth* v. *Adams*, 458 Mass. 766, 775 (2011).

According to several of the witnesses, the defendant was present when Fausto intervened and struck the first blow against Lopes. Just before the shooting, Fausto was on top of Sandy and was beating him, and bystanders were attempting to separate Fausto from Sandy. There is no dispute that the defendant had time to assess the status of the fight before firing. Even if the defendant subjectively understood before intervening that Fausto was "getting jumped," no reasonable person in the defendant's position could have concluded that, at the moment the defendant fired, Fausto would have been justified in using deadly force in self-defense. There was no error.

b. *Voluntary manslaughter.* "An instruction on voluntary manslaughter is appropriate 'if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), quoting *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996). A manslaughter instruction is not warranted when the defendant "cooled off" and "regained a measure of self-control" before attacking the victim. *Commonwealth* v. *Smith*, 460 Mass. 318, 325-326 (2011). "[O]ur case law is clear that where the alleged provocation is followed by at least a few

minutes during which the defendant and the victim are separated, and then the defendant seeks out the victim, a charge of voluntary manslaughter based on provocation is not warranted." *Commonwealth* v. *Colon*, 449 Mass. 207, 221, cert. denied, 552 U.S. 1079 (2007), and cases cited.

After being struck by Lopes, the defendant left the party, went down the stairs, and walked around behind the building. After speaking with DeMiranda, he then went back upstairs and fired into the crowd. Four to five minutes had elapsed since the altercation involving the baby. The defendant leaving the scene of the fight, in conjunction with the passage of time, objectively indicated, as a matter of law, that the defendant had "cooled off." No manslaughter instruction was warranted. *Commonwealth* v. *Coleman*, 366 Mass. 705, 707-708, 715 (1975) (reduction of murder verdict to manslaughter not warranted when defendant left scene after being punched, and then returned and shot victim several minutes later).

8. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record of this case pursuant to our responsibilities under G. L. c. 278, § 33E. The evidence to convict was strong, and the few errors on collateral matters did not cause prejudice. We conclude that there is no basis for reducing the defendant's degree of guilt on the murder conviction or ordering a new trial.

*Judgments affirmed.*