## COMMONWEALTH *vs.* DANIEL ROSA.

Hampden. January 10, 2014. - May 20, 2014.

Present: IRELAND, C.J., CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Firearms. Evidence,* Constructive possession, Telephone conversa-
tion, Relevancy and materiality, Joint venturer, Expert opinion. *Imprison-
ment,* Inmate telephone calls. *Telephone. Joint Enterprise. Constitutional
Law,* Privacy. *Privacy. Practice, Criminal,* Capital case, Verdict, Instruc-
tions to jury.

At a murder trial, the judge did not err in admitting in evidence bullet shell
casings, live ammunition, and the defendant's driver's license, found by
police officers hours after the shooting in the bedroom of a third party,
where the evidence had a rational tendency to prove the defendant's par-
ticipation in the victim's murder, in that the items permitted the inference
that they were hidden at the third party's house in furtherance of an al-
leged joint venture. [236-238]

At a murder trial, the judge did not err in admitting in evidence portions of a
recorded telephone call that the defendant placed while being held in a
house of correction, where the defendant's persistent use of profanity dur-
ing the call, although prejudicial, was not more prejudicial than probative;
and where no expert testimony was required to assist the jury in understand-
ing the "street jargon" spoken by the defendant during the call. [238-242]

Officials at a house of correction did not violate the criminal defendant's
rights under the First and Fourth Amendments to the United States Constitu-
tion by monitoring and recording a telephone conversation he had while
being held there, where there was evidence that the monitoring and re-
cording were carried out in accordance with regulations that serve the
legitimate penological purpose of advancing the security of prisons; further,
there was no merit to the claim that the officials violated the defendant's
constitutional rights by forwarding a summary of his conversation to law
enforcement officials without making an individualized determination that
there was a legitimate penological purpose for doing so. [242-244]

At the trial of indictments charging, inter alia, murder in the first degree on a
theory of joint venture, the absence of evidence that the defendant knew
that his two companions were armed with guns did not render insufficient
the evidence of the defendant's participation in a joint venture with one or
both of them, given that possession of a weapon is not an element of
murder in the first degree committed with deliberate premeditation; further,
the judge's instructions to the jury, which did not include the element that
the defendant knew that one or both of the joint venturers were armed,
were not erroneous. [244-246]

At the trial of indictments charging, inter alia, murder in the first degree on a

theory of joint venture or accomplice liability, the judge was not required to give the jury a specific unanimity instruction or provide them with a special verdict slip. [246]


INDICTMENTS found and returned in the Superior Court Department on March 29, 2011.

The cases were tried before *Peter A. Velis*, J.

*Stewart T. Graham, Jr.*, for the defendant.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. A Superior Court jury found the defendant, Daniel Rosa, guilty of murder in the first degree on a theory of deliberate premeditation and of possession of a firearm without a license. The defendant appeals, arguing that (1) the trial judge erred in admitting evidence of bullet shell casings and live ammunition because the Commonwealth failed to prove that the defendant constructively possessed these items; (2) it was unduly prejudicial and violative of due process to admit the recording of a jailhouse telephone call made by the defendant in which he used street jargon and offensive language; (3) the defendant's constitutional rights were violated by the monitoring of his telephone calls from jail and a jail officer's sending to law enforcement authorities information derived from the calls; (4) the evidence was insufficient to prove the defendant guilty of murder in the first degree on a joint venture theory; and (5) the trial judge erred in failing to provide a special verdict slip and special jury instruction requiring the jury to determine separately whether the defendant was guilty of murder in the first degree as a principal or as an accomplice. We affirm the defendant's convictions and decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* We recite the facts as the jury could have found them at trial, reserving certain details for later discussion. On January 26, 2011, at approximately noon, the victim, David Acevedo, was killed by a single gunshot wound to the back. The shooting occurred on Riverton Road in Springfield, near the home of Eric Caraballo, Sr., a mutual friend of the victim's and the defendant's.

Earlier that morning, at 9:30 or 10 A.M., the defendant had

gone to his mother's home in Springfield to visit his daughter
and to meet with a friend, Marcus Dixon. A dark-colored, two-
door Honda automobile belonging to Dixon was parked there
because the defendant was "holding" the car for Dixon. The
defendant and Dixon left together in the Honda shortly after
they both had arrived. Soon thereafter, the defendant went to
Caraballo's house. At some point the victim also arrived at
Caraballo's house and confronted the defendant about money
that the defendant purportedly owed him. A heated verbal
exchange ensued and the defendant and the victim began to
fight, but Caraballo intervened. The defendant and the victim
went outside to continue fighting while Caraballo remained
inside. Several minutes later, the victim returned inside with a
ripped, bloodied shirt, but he appeared otherwise unhurt. The
defendant did not return inside.

Between approximately 10:30 and 11:30 a.m. the defendant
made and received a series of telephone calls to and from Dixon
and another friend, Jerell Brunson. Just before noon, the defend-
ant telephoned Caraballo on his cellular telephone asking for
the victim to meet him outside of Caraballo's house again. The
victim and Caraballo went outside and they exchanged ad-
ditional telephone calls with the defendant. Snow banks obscured
their view of the defendant, but when he appeared, the victim
went to meet the defendant near a stop sign at the corner of
Riverton Road and Denver Street; Caraballo remained in his
driveway. Moments later, Brunson and Dixon began walking
down from the top of the hill on Denver Street toward Riverton
Road; Dixon's Honda was parked near the top of the hill. As
they walked, Brunson and Dixon began shooting in Caraballo's
direction.[1] Bullets struck an apartment building across the street
from Caraballo's house as well as a car parked in front of that
building. The victim turned away from the defendant and ran
across the street toward the apartment building, yelling, "Duck!"
Caraballo dropped to the ground and lay on his stomach behind
the snow banks, pretending to be shot. The defendant took
several steps toward the victim, who was running away. Cara-
ballo saw the defendant holding a silver gun covered by a blue

---

[1]According to the defendant, who testified at trial, Brunson had a .44 gauge
revolver and Dixon carried a smaller gauge revolver.

bandanna, one arm extended toward the victim. He heard "loud booms" peal from the defendant's hand. A single bullet struck the victim's back at a straight angle, injuring his spinal cord and causing cardiac arrest. The gunfire ceased and the defendant turned to Caraballo and said, "Remember that I love you."

The defendant, Brunson, and Dixon retreated quickly up Denver Street toward the Honda. A man who lived on Denver Street, Gary O'Neal, observed a light-skinned man and a dark-skinned man, both holding revolvers, climb into the Honda.[2] Of the three men (the defendant, Brunson, and Dixon), only the defendant had light skin. The three drove in the Honda to Brunson's house at 39 Slater Avenue, approximately one mile away, where they parted ways.[3]

After being shot, the victim lay on the ground bleeding, and died before the paramedics arrived some minutes later. O'Neal, the Denver Street resident, had observed the rear license plate of the Honda he saw two men climbing into, and he wrote the number in the snow on his front porch. His recollection was close to the rear license plate number on the dark, two-door Honda that police officers later discovered at Brunson's house. Later that day, O'Neal identified the defendant from a photographic array provided by the police, stating that he was sixty per cent certain it was the man he saw leaving the crime scene holding a revolver.

Police investigators found two of three projectiles that struck the apartment building across the street from Caraballo's house. The projectiles included one .44 caliber bullet and another scrap of lead that was likely the core of a second .44 caliber bullet.

[2]Another Denver Street resident also heard gunshots and saw a man — possibly with light skin — running or walking quickly up the hill away from the crime scene.

[3]The evidence that the defendant, Brunson, and Dixon drove together in the Honda from Denver Street to Brunson's house was provided by the defendant's trial testimony. According to the defendant, once he separated from Brunson and Dixon after arriving at Brunson's house, he walked to a nearby restaurant to meet a friend. Dixon went back to the defendant's mother's house where earlier that morning he had parked a yellow car that also belonged to him. There was no direct evidence presented about where Brunson went after driving in the Honda to his house, but the jury could have inferred that he went inside the house and hid the shell casings, driver's license, and ammunition.

The police were unable to recover the bullets that struck the car parked in front of the apartment building, or the bullet that killed the victim. The investigators did not find any shell casings at the crime scene, a fact suggesting that the gunmen used revolvers.

Within hours of the shooting, police encountered Dixon as he approached a parked car outside the defendant's mother's residence. After ascertaining Dixon's identity, the officers detained him for questioning. Dixon spoke with the officers at the police station, and then drove with them to locations where he had been during and after the shooting, including 39 Slater Avenue, Brunson's house. At that point, two police officers secured the premises of 39 Slater Avenue, leading to the discovery of the Honda parked in back, while other officers obtained a search warrant for the interior of the house. In the basement area where Brunson stayed, police discovered four casings for .357 caliber bullets and one casing for a .38 caliber bullet in a plastic storage unit next to Brunson's bed. They also found two live .44 caliber bullets in a clay vase on a shelving unit, as well as the defendant's driver's license stashed in a narrow slit in the underside of the box spring in the bed. Analysis of the shell casings revealed that all the .357 caliber bullet casings were fired from the same weapon, which never has been recovered.[4] At trial, two witnesses testified to seeing the defendant with a large, silver revolver during the months prior to the murder. Although the defendant denied possessing such a firearm, he admitted to having previously a .22 caliber gun that he and a friend referred to as a ".350."[5]

In his trial testimony, the defendant explained that he had met up with both Dixon and Brunson at the defendant's mother's house in the morning of January 26, 2011, before going to Caraballo's house. Just before noon, Dixon drove Brunson and the defendant in the Honda directly from the defendant's mother's

[4]A State police officer experienced in ballistics testified that the .38 caliber casing may have been fired from the same weapon.

[5]The Commonwealth introduced in evidence a redacted recording of a telephone conversation between the defendant and an unidentified male; the recorded conversation included statements by the defendant reflecting a knowledge of firearms. We discuss the recording and its contents in greater detail *infra.*

house to Caraballo's neighborhood. The defendant had planned to purchase "crack" cocaine from the victim so that Dixon could resell it. The defendant had met the victim near the stop sign at the corner of Denver Street and Riverton Road to exchange money for the drugs, which the victim passed to him in a blue cloth, while Caraballo stood in his driveway. Suddenly, Brunson and Dixon began shooting from the top of Denver Street, surprising the defendant because he was unaware that his friends had guns. Dixon walked nearly all of the way down the hill and shot the victim. After the shooting, the defendant left the crime scene with Brunson and Dixon in the Honda. The defendant stated that he did not have a firearm with him at any time during the shooting incident.

The Commonwealth proceeded against the defendant on the alternative theories of principal and joint venture liability.[6]

2. *Discussion.* a. *Shell casings, bullets, and the defendant's driver's license.* The defendant asserts that the trial judge erred in denying his motion in limine to exclude from evidence the bullet casings, live ammunition, and the defendant's driver's license found by the police hours after the shooting. The defendant argues there was no evidence at trial that he lived in, used, or ever was present in Brunson's bedroom, and he maintains that the record fails to show he had knowledge that any of the items were there, much less the ability and intent to exercise dominion and control over them. In the defendant's view, the presence of his license in the box spring on the bed, with no indication of who placed it there or when, was an inadequate basis on which to base a claim of constructive possession of the ammunition or even of the license itself.[7]

---

[6]The record indicates that the police arrested and questioned Brunson and questioned Dixon in connection with this shooting incident, but it contains no information about any legal proceedings against either individual.

[7]The defendant argues that his claim of error relating to the admission of this evidence was preserved, because he challenged its admissibility in a motion in limine that the judge considered before and again during trial and finally denied. The Commonwealth disagrees, contending that the defendant failed to preserve the objection by failing to renew it when the evidence actually was introduced at trial. Whether an objection is preserved in connection with the denial of a motion in limine depends on the particular circumstances of the case, see *Commonwealth* v. *Jones*, 464 Mass. 16, 19 & n.4 (2012);

We review a judge's evidentiary rulings on a motion in limine for abuse of discretion. *Commonwealth* v. *Spencer*, 465 Mass. 32, 48 (2013), quoting *Commonwealth* v. *Arrington*, 455 Mass. 437, 441 n.6 (2009). "Whether proffered 'evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error.' " *Spencer, supra*, quoting *Commonwealth* v. *Sylvia*, 456 Mass. 182, 192 (2010).

The trial judge did not abuse his discretion by admitting this evidence. The defendant emphasizes the absence of evidence connecting him individually to the casings and live ammunition. He is correct that there was no evidence of his constructive possession of these items, but as the Commonwealth points out, the sufficiency of evidence to support an inference of constructive possession is not the issue, because the ballistics and identification evidence was not being offered to prove a crime for which possession is an element. Rather, the question was whether the evidence had a rational tendency to prove the defendant's participation in the victim's murder. See *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989), quoting *Commonwealth* v. *Chretien*, 383 Mass. 123, 136 (1981). The Commonwealth was proceeding at least in part on a joint venture theory in this case. The shell casings, ammunition, and identification card were relevant because these items had a tendency to make more probable the existence of a joint venture among the defendant, Dixon, and Brunson to commit the crime. See *Commonwealth* v. *Arroyo*, 442 Mass. 135, 144 (2004) (defining relevant evidence). See also *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 851 (2011). Police officers discovered the items in Brunson's house reasonably close in time to the shooting incident; they also located at the same address the Honda in which the three perpetrators were seen leaving the scene of the shooting. In addition, the jury could infer that the casings and live rounds found in Brunson's bedroom were connected to the guns used

here, the record appears to provide more support for the defendant's position than the Commonwealth's. We do not need to resolve the issue, however, because we conclude there was no error committed.

by the perpetrators of the crime,[8] or at a minimum that this evidence tended to show that at least one of the perpetrators — Brunson — had access to the "means of committing the crime." See *Commonwealth* v. *McGee*, 467 Mass. 141, 156 (2014), quoting *Commonwealth* v. *Barbosa*, 463 Mass. 116, 122 (2012).[9]

Together, the ballistics evidence and driver's license challenged by the defendant permitted the inference that these items were hidden at Brunson's house in furtherance of the alleged joint venture between the defendant and his two companions to kill the victim. The judge's decision to admit these items constituted an evidentiary ruling well within the permissible scope of his discretion. The defendant's claim fails.

b. *Recording of detainee telephone call.* The defendant challenges on two separate grounds the admission in evidence of portions of a recorded telephone call that he placed on February 15, 2011, while being held at the Hampden County house of correction (jail). He argues first that the recording was far more prejudicial than probative because (a) much of the conversation was conducted in subculture slang that could not be understood by a lay jury without explanatory expert testimony; and (b) the conversation was replete with racial epithets and curse words that painted him as a person of bad character in the minds of

[8]Trooper John Shrijn, the Commonwealth's ballistics witness, testified that four of the shell casings found in Brunson's living space were fired from the same gun, possibly a .357 caliber revolver. A witness had observed the three men at the crime scene holding revolvers, Caraballo's son testified about seeing the defendant with a .357 caliber revolver prior to the crime, and in a recording of the defendant's telephone conversation from the jail, he spoke about possessing a .350 caliber weapon. In light of the undisputed evidence that revolvers do not eject casings automatically, the jury could infer that the casings found in Brunson's bedroom had been removed from the revolver or revolvers used by the perpetrators and hidden in the bedroom. Additionally, police officers found live .44 caliber bullets in Brunson's space and pieces of .44 caliber bullets at the crime scene; the defendant testified that Brunson shot a .44 caliber gun at the shooting incident.

[9]It is unnecessary to offer "direct proof" that a "particular weapon was in fact used in the commission of the crime." *Commonwealth* v. *McGee*, 467 Mass. 141, 156 (2014), quoting *Commonwealth* v. *Barbosa*, 463 Mass. 116, 122 (2012). See *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950). Weapons-related items, including ammunition and shell casings, are admissible to show that means of committing the crime were available. See *Commonwealth* v. *Gagnon*, 408 Mass. 185, 199-200 (1990) (spent cartridge admissible because same caliber as bullet retrieved from victim's body).

the jurors. His second argument is that the jail's monitoring and recording of the call, and its transmittal of the recording to law enforcement authorities, violated his rights under the First and Fourth Amendments to the United States Constitution.

i. *Prejudice.* The jail recorded the defendant's telephone call while he was being held in pretrial custody. During the call, the defendant spoke with a man identified only as "Blue." The conversation covered a range of topics, including the events surrounding the shooting and killing of the victim on January 26, 2011, the people who were present during the shooting incident, and a general discussion about guns. Before trial, the Commonwealth filed a motion in limine to admit the recording of the telephone call, and the defendant filed a motion in limine to exclude it.[10] The judge heard arguments on the motions before listening to the recording, and then he heard additional arguments. The judge admitted the recording but redacted a number of portions that he deemed prejudicial or irrelevant, including references to attorney-client discussions and statements implicating gang-related activity. The judge admitted the redacted recording as a trial exhibit, but he did not admit a transcript of the telephone call in evidence. The court provided a set of headphones to each juror to listen to the recording during trial. The admitted portions of the recording totaled approximately one-half of the thirty-minute telephone call.

The defendant's objection to admission of the telephone call recording was preserved, and we review generally for prejudicial error. See *Commonwealth* v. *Gambora*, 457 Mass. 715, 723-724 (2010), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994) (review for prejudicial error requires court to determine whether claimed error "was nonprejudicial in the sense that we

[10]In his motion in limine, the defendant argued that (1) there was no notice that the jail could turn over to law enforcement information gleaned from a call, and that doing so was a "fishing expedition" to seek out statements of prosecutorial interest; (2) the call must be authenticated; (3) the content of the call was highly prejudicial due to the defendant's use of profanity and racial epithets — evidence that, he argued, the Commonwealth was "back-dooring" as evidence of his bad character; and (4) his consciousness of guilt was not clear from the content of the conversation. The defendant also asserted that the frequent use of profanity and the word "nigger" during the telephone call was prejudicial because the jury could take offense at the language or improperly infer that he was a member of a criminal organization or gang.

are sure 'that the error did not influence the jury, or had but very slight effect' ").

As indicated, the defendant contends that expert testimony was required to assist the jury to understand the "street jargon" spoken by the defendant during the telephone call; without an expert, he claims, the evidence of the call was inadmissible.[11] Expert testimony is useful where speakers engage in coded conversation or speak about a subject using specialized vocabulary.[12] This is not the case here. Portions of the recording were (and are) difficult to understand by themselves,[13] but the difficulty arises from the speakers' enunciation, the quality of the recording, and, most importantly, a lack of context provided during the conversation. An expert would not have been able to offer contextual information to aid the jury in understanding the conversation. However, in its case-in-chief the Commonwealth *did* furnish context and helped to give meaning to the portions of the call the jury heard.[14] Jurors could be expected to apply their knowledge and understanding of the trial evidence to interpret the meaning of the recorded telephone conversation.

[11]The defendant did not assert the need for expert testimony to interpret the recording either in his motion in limine or during trial. Accordingly, we review this particular aspect of the defendant's claim of error to determine whether there was a substantial likelihood of a miscarriage of justice.

[12]Expert testimony may be admitted to explain the meaning of conversations conducted in "street-level jargon," or other coded language, see *United States* v. *Baptiste*, 596 F.3d 214, 222 & n.6 (4th Cir. 2010), but "interpretations of clear conversations are not admissible." *United States* v. *Gonzalez-Maldonado*, 115 F.3d 9, 17 (1st Cir. 1997). See *United States* v. *Gibbs*, 190 F.3d 188, 213 (3d Cir. 1999), cert. denied, 528 U.S. 1131 (2000), quoting *United States* v. *Dicker*, 853 F.2d 1103, 1108-1109 (3d Cir. 1988) (expert testimony permitted to interpret "coded or 'code-like' conversations," but "interpretation of clear conversations is not helpful to the jury, and thus is not admissible"). See also *United States* v. *Griffith*, 118 F.3d 318, 321-322 (5th Cir. 1997) (expert testimony allowed to explain slang pertaining to drug trade); *United States* v. *Delpit*, 94 F.3d 1134, 1144-1145 (8th Cir. 1996) (same).

[13]Both the judge and the prosecutor expressed difficulty comprehending portions of the recording.

[14]Examples include Caraballo's testimony about the shooting incident, which helped furnish context for comments made by the defendant during the telephone call about the shooting incident as well as about the victim; and information about firearms provided by Trooper John Shrijn, including his descriptions of .357 caliber revolvers and Glocks, and of how guns deposit a residue when fired.

Cf. *Commonwealth* v. *Bundy*, 465 Mass. 538, 546-547 (2013)
(expert testimony unnecessary on use and operation of video
game console where witnesses testified about its operation and
Commonwealth also introduced explanatory photographic
evidence). Turning to the claim about the overly prejudicial effect
of permitting the jury to hear the language used during the
telephone call, there is no question that the defendant's (as well
as Blue's) use of the word "nigger" (or "nigga") and curse
words was constant. The defendant argues the jury would find all
this language, and the epithet "nigger" in particular, highly of-
fensive, and would conclude from it that the defendant was a bad
person who was more likely to have committed this crime.

It would be difficult to argue that the defendant's persistent
use of profanity during the telephone call was not prejudicial,
and the defendant correctly notes the risk that jurors could draw
inappropriate conclusions about his propensity toward criminal-
ity based on the language. But the question is not whether
admission of the telephone call containing this language was
prejudicial; it is rather whether it was unduly prejudicial, or
more prejudicial than probative. See generally *Commonwealth*
v. *Rousseau*, 465 Mass. 372, 388 (2013), quoting *Arroyo*, 442
Mass. at 144 ("evidence is admissible unless unduly prejudicial,
and, '[i]n weighing the probative value of evidence against any
prejudicial effect it might have on a jury, we afford trial judges
great latitude and discretion, and we uphold a judge's decision
in this area unless it is palpably wrong' "). We conclude that it
was not. The defendant is most concerned about the use of the
word "nigger." As offensive as the word is, when one listens
to the recorded conversation, it becomes very clear almost im-
mediately that the defendant, and Blue, were not using the word
as a racial epithet or in a pejorative sense but, rather, as the
defendant testified, as a term of familiarity, such as "guy," or
"dude."[15] And the defendant's persistent use of curse words,
although offensive, was so constant that we think it likely the
jury heard the language as a pattern of speech without intended

---

[15]Jurors reasonably could infer that the defendant did not use the word
"nigger" pejoratively at all unless paired with another term such as "bitch."

meaning.[16] On the probative side of the ledger, the substantive contents of the recorded call were directly relevant to the crimes charged. In particular, the recorded conversation included statements by the defendant about his participation in the shooting incident; supporting the existence of a joint venture among the defendant, Brunson and Dixon; reflecting consciousness of guilt;[17] and supporting his possession of a firearm. The judge proceeded carefully in redacting portions of the recording that would have had the most prejudicial effect, such as statements that could be interpreted as gang references; redacting all, or even most, of the problematic language would have been impossible because it was so intermingled with everything said.

The weighing of probative value versus prejudicial effect of evidence in the context of a trial is an issue left particularly to the discretion of the trial judge. See, e.g., *Rousseau*, 465 Mass. at 388, quoting *Arroyo*, 442 Mass. at 144; *Commonwealth* v. *Anderson*, 445 Mass. 195, 208-209 (2005), quoting *Commonwealth* v. *DeSouza*, 420 Mass. 667, 670 (1999). The judge did not abuse his discretion in admitting the redacted recording of the defendant's jailhouse call, and there was no error. See *Commonwealth* v. *Robidoux*, 450 Mass. 144, 158-159 (2007).

ii. *Violation of constitutional rights.* The defendant argues that jail officials violated his rights under the First and Fourth Amendments by monitoring and recording his telephone conversation and by forwarding a summary of it to law enforcement officials without any showing of a legitimate penological purpose for doing so.

We disagree. As the Commonwealth points out, this court's decisions have made clear that the monitoring and recording of his telephone calls by jail or prison officials does not violate a

---

[16]An expert witness perhaps could have been called to explain the use of curse words and, particularly, use of the word "nigger" among groups that the defendant might be part of, but as indicated in the text, it seems reasonably clear to us that the jury would have been able sufficiently to understand the defendant's use of these words and terms simply by listening to the recorded telephone call itself.

[17]For example, the defendant's consciousness of guilt is present in his discussion of turning over a blue rag without gunshot residue and the statement about how it would have been "gravy" had Caraballo been shot.

criminal defendant's constitutional rights[18] where, as here, the defendant and other participants in the telephone conversation are warned before the call that it will be monitored and recorded.[19] See *Commonwealth* v. *Fitzpatrick*, 463 Mass. 581, 602 (2012); *Commonwealth* v. *Gomes*, 459 Mass. 194, 206-207 (2011), and cases cited. There was evidence here that the monitoring and recording were carried out in accordance with regulations, and our decisions have approved of these types of regulations generally as serving the legitimate penological purpose of advancing the security of prisons.[20] See *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 690-692 & nn.7, 8 (2009) (*Grand Jury Subpoena*); *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764, 769-770 (1996).[21]

The defendant's principal point appears to be that although

[18]The defendant cites both the First and Fourth Amendments to the United States Constitution, but the principal constitutional claim appears to be lodged in the Fourth Amendment and, specifically, the protection offered by the amendment to a person's reasonable expectation of privacy. See *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 688-689 (2009) (*Grand Jury Subpoena*) (Fourth Amendment). See also *id.* at 689-692 (art. 14 of Massachusetts Declaration of Rights).

[19]Officer Jessica Athas, an intelligence officer at the Hampden County house of correction (jail), testified that the warning of monitoring and recording is included in the inmate handbook and is posted near the inmate telephones, and at the outset of each telephone call, a recorded voice tells the inmate and other participants on the call that the call is being recorded.

[20]The defendant argues that the Commonwealth never introduced the jail "regulations" referred to by Officer Athas. The defendant did not raise any point about the nonproduction of regulations when arguing against the admission of the recorded jail call before or at trial, and we have not made the production of a correctional facility's telephone monitoring regulations a condition precedent to admission of evidence of any recorded calls. Nothing in the record suggests that the jail's regulations were likely to be materially different from the Department of Correction regulations discussed in *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764 (1996), or the regulations of the Suffolk County house of correction discussed in *Grand Jury Subpoena*, 454 Mass. 685. Even if error, the nonproduction of the jail's regulations in this case did not create a substantial likelihood of a miscarriage of justice.

[21]The defendant cites decisions of the United States Supreme Court in support of his over-all argument, including *Thornburgh* v. *Abbott*, 490 U.S. 401 (1989); *Turner* v. *Safley*, 482 U.S. 78 (1987); and *Hudson* v. *Palmer*, 468 U.S. 517 (1984). See *United States* v. *Savage*, 482 F.2d 1371 (9th Cir. 1973), cert. denied, 415 U.S. 932 (1974). These cases do not support the defendant's implicit claim that the decisions of this court cited here in the text are contrary to the requirements of the First and Fourth Amendments.

regulations that provide for the monitoring of inmate telephone calls may serve legitimate penological purposes as a general matter, before evidence of a call may be used against a defendant at trial, the government must establish that the monitoring of that particular call was justified as advancing such a legitimate purpose. The claim fails. The premise of our decisions upholding and discussing such regulations is that a regulation or rule calling for regular monitoring and recording of all telephone calls made by or to all inmates is an appropriate prophylactic means to implement the penological purpose of security, both within and outside the institution. See *Grand Jury Subpoena*, 454 Mass. at 690-691; *Cacicio*, 422 Mass. at 769-770. There is no suggestion in any of our cases that it is necessary to make an individualized determination whether the monitoring and recording of a particular inmate call serves a penological purpose; indeed, this concept would be antithetical to the prophylactic purpose of the regulation, because it is at best difficult (and more likely impossible) to identify in advance specific telephone calls that may raise safety and security issues.[22]

c. *Joint venture.* The defendant argues that the evidence was insufficient to find him guilty of murder under a joint venture theory because there was no showing that he knew Brunson and Dixon, his two alleged coventurers, were armed;[23] his related contention is that the trial judge's instructions to the jury on joint venture erroneously failed to explain that the Commonwealth must prove the defendant knew the coventurers were armed.

We reject the defendant's claims. In *Commonwealth* v. *Britt*,

---

[22]To the extent the defendant separately challenges on appeal Officer Athas's transmittal of a summary of his telephone call to law enforcement officials, that challenge also fails. Athas testified that she referred this particular call to "law enforcement" because it contained potential threats to individuals outside the prison. During the call, Blue, the person with whom the defendant was speaking, stated something about "knocking out" members of the victim's family, and the defendant responded, "Do that." Apparent threats relating to the family of a homicide victim provide justification for sending information about the contents of the call to police, even without a subpoena or other form of process seeking it. See *Grand Jury Subpoena*, 454 Mass. at 690 n.8. See also *id.* at 697 n.14 (Marshall, C.J., dissenting).

[23]The defendant moved for a required finding of not guilty with respect to the joint venture theory at the close of the Commonwealth's case.

465 Mass. 87, 99-100 (2013), this court overruled a line of earlier decisions, beginning with *Commonwealth* v. *Lydon*, 413 Mass. 309 (1992), standing for the proposition that where a defendant is tried "[u]nder a theory of joint venture premeditated murder" and the coventurer possessed and used a gun, proof of the defendant's knowledge that the coventurer was armed is required. See *id.* at 312 n.2. We concluded in *Britt* that in the case of a crime that does *not* include possession or use of a dangerous weapon as an element, there is no need to prove the defendant's knowledge of the presence of the weapon in order to convict on a joint venture theory. See *Britt, supra* at 100 ("The Commonwealth should bear the burden of proving only that a joint venturer had knowledge that a member of the joint venture had a weapon where the conviction on a joint venture theory is for a crime that has use or possession of a weapon as an element"). Rather, what is necessary in such a case is proof that "the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent." *Id.* at 100-101, quoting *Commonwealth* v. *Zanetti*, 454 Mass. 449, 467 (2009).

We decline to overrule *Britt*. Because possession of a weapon is not an element of murder in the first degree committed with deliberate premeditation, there was no need for the Commonwealth to prove that the defendant knew Brunson and Dixon were armed with guns. Accordingly, the absence of such proof does not itself render insufficient the evidence of the defendant's participation in a joint venture with one or both of the two men.[24] Similarly, the judge's jury instructions, which did not

---

[24]The defendant's challenge to the sufficiency of the joint venture evidence on appeal is limited to the issue whether he knew that the other joint venturers were armed. Nevertheless, the review we have conducted under G. L. c. 278, § 33E, of all of the evidence relating to the defendant's participation in a joint venture persuades us that even a more generalized sufficiency challenge would fail. There was strong evidence that the defendant knowingly participated in the victim's murder with Dixon and Brunson and that he did so with deliberate premeditation, regardless of whether he or one of the other two men shot the victim. The evidence included a series of telephone calls among the three men that took place directly before the shooting of the victim occurred, observations by bystander witnesses that all three men fired guns at or in the direction of the victim and Caraballo during the incident, and other observations

include the element that the defendant knew that one or both of the joint venturers were armed, were not erroneous.

d. *Specific unanimity instruction and special verdict slip.* The defendant argues that due process requires the jury to reach a unanimous determination beyond a reasonable doubt regarding the specific criminal act for which a defendant is convicted, including the elements of accomplice liability. He contends that a conviction based on a theory of joint venture — i.e., accomplice liability — requires proof of factual elements that are distinct from the requirements of proof based on a theory of principal liability — i.e., the defendant was the shooter. His rights were abridged, the defendant claims, because there was conflicting evidence about his role as either an accomplice or a principal in the victim's murder, and the trial judge erred in not giving the jury a specific unanimity instruction and in not providing them with a special verdict slip to clarify the specific grounds of conviction.

The defendant's argument in substance asks us to reverse our decision in *Zanetti*, 454 Mass. at 467-468, where we clarified that it was not necessary, in a case tried on a theory of joint venture or accomplice liability, for the jury to determine specifically whether the defendant participated as an accomplice or as a principal, so long as there was sufficient evidence of the defendant's active participation in the crime and that he had or shared the necessary intent. In such a case, use of a general verdict slip is also appropriate. See *id.* at 468. We decline to overrule *Zanetti*. The trial judge properly instructed the jury in accordance with that case, and properly used a general verdict slip.

e. *G. L. c. 278, § 33E.* We have thoroughly reviewed the record as required under G. L. c. 278, § 33E, and find no grounds to warrant relief.

*Judgment affirmed.*

by bystanders that the three men left together in the Honda immediately after the victim was shot. The shell casings, ammunition, and driver's license uncovered at Brunson's residence lent further credence to the joint venture theory.