NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

11-P-945                                    Appeals Court

COMMONWEALTH vs. BROWNING M. MEJIA.


No. 11-P-945.

Barnstable.      December 4, 2014. - September 8, 2015.

Present: Cohen, Fecteau, & Massing, JJ.


Assault and Battery by Means of a Dangerous Weapon. Evidence,
     Admissions and confessions, Relevancy and materiality,
     Telephone conversation, Joint enterprise. Firearms.
     Imprisonment, Inmate telephone calls. Telephone.


     Indictments found and returned in the Superior Court
Department on June 12, 2009.

     The cases were tried before Gary A. Nickerson, J.


     Rosemary Curran Scapicchio (Jillise McDonough with her) for
the defendant.
     Elizabeth A. Sweeney, Assistant District Attorney, for the
Commonwealth.


     COHEN, J. On a cold, snowy evening in January, 2009, a

group of unidentified individuals dressed in black opened fire

on a Chevrolet Impala parked on Pontiac Street in Hyannis. The

occupants of the vehicle, two men and two women, were awaiting

the return of the defendant, Browning Mejia, to complete a drug

transaction.  Both of the male occupants were shot and wounded; the female occupants were unharmed.

In connection with this incident, the defendant was indicted on two counts of assault and battery by means of a dangerous weapon, pursuant to G. L. c. 265. § 15A(b), and four counts of armed assault with intent to murder, pursuant to G. L. c. 265, § 18(b).  At the conclusion of the defendant's Superior Court trial, the case was submitted to the jury on joint venture instructions in accordance with Commonwealth v. Zanetti, 454 Mass. 449, 467-468 (2009).  The jury found the defendant guilty of both counts of assault and battery by means of a dangerous weapon, and not guilty of the remaining charges.

On appeal, the defendant's principal claims relate to the admission of evidence of a handgun linked to the shooting, and the admission of excerpts from recorded telephone calls that he made from jail.  We affirm.

Background.  We briefly summarize the trial evidence relevant to the issues presented, reserving further details for later discussion.

On January 15, 2009, Christine Ferreira, Kristen Asack, Tom Walwer, and Neiyamia (Neil) Jackson spent the late afternoon and early evening together, driving from place to place in Walwer's

black Chevrolet Impala.[1]  After going to the Cape Cod Mall, the group decided to buy some marijuana.  Ferreira and Asack both knew the defendant socially and, as corroborated by telephone company records, called his cellular telephone (cell phone) to arrange to purchase marijuana from him.  The defendant returned the call from a different number associated with a prepaid cell phone, which, unlike the number the women first called, was not registered to his name.  After missing each other several times, the defendant and Ferreira finally spoke.  The defendant instructed her to meet him on West Main Street by the Cape Glen condominiums, and Walwer drove the foursome to that location.  The defendant, who was wearing black clothing, came over to the car and gave Ferreira a bag of marijuana in exchange for money.  The group then left and began driving to Yarmouth.

After examining the marijuana, Ferreira and Asack called the defendant to complain about it.  The defendant said that he had given them the wrong bag, and that they should meet him on

---

[1] Ferreira and Asack were friends, and Walwer was Ferreira's roommate.  Jackson was visiting from Florida and was a friend of Ferriera's boyfriend, who was in jail at the time.  Ferreira was the prosecution's key eyewitness, although Asack testified briefly, as well.  Both women testified under grants of immunity and were reluctant and evasive witnesses.  On numerous occasions, both the prosecutor and defense counsel brought out conflicting statements made by them when they appeared before the grand jury.  In addition, Ferreira, who was incarcerated on an unrelated matter at the time of trial, was impeached on cross-examination with prior convictions.  Walwer also was called to testify, but after unexpectedly asserting his Fifth Amendment privilege, he was excused.

Pontiac Street where he would exchange it.  Walwer proceeded to Pontiac Street, which is a dead-end road, drove to the end, and turned the car around so that it was facing the top of the street.  By this point, it was close to 7:00 P.M.

The defendant approached wearing a black, puffy North Face jacket[2] and a ski mask that was pulled down so that his face was visible.  After patting his pockets, the defendant said that he must have left the bag of marijuana in the house.  He told the group that he would be right back, and walked away.

Five to seven minutes later, several individuals[3] wearing black North Face jackets appeared at the top of the street and began shooting at the Impala.  According to Ferreira, as many as fifteen to twenty gunshots were fired.  The windshield shattered, and Walwer and Jackson, who were in the front seat, both suffered gunshot wounds.  Ferreira and Asack, who were crouched down in the backseat, were not hurt.  Despite his injuries, Walwer was able to drive the group to Cape Cod hospital.

---

[2] Ferreira volunteered, "We all have North Face."

[3] At trial, Ferreira estimated that there were four or five assailants, but she acknowledged that in her grand jury testimony she had said that there were only two.  Police recovered bullet casings from three different types of firearms (a .32 caliber, a .40 caliber, and a nine millimeter), consistent with there being three shooters.

The defendant was arrested on February 10, 2009. At the time of his arrest, he was wearing a black North Face "winter coat." A dark-colored neoprene ski mask was found in the vehicle in which he was riding.

There was evidence suggesting some preexisting antagonism between individuals associated with the defendant, and Walwer and Jackson. Ferreira testified to an episode in December, 2008, at the Dunkin Donuts where she worked. Although the defendant was not present, there was "tension" between two men whom Ferreira knew to be friends of the defendant, and Walwer, Jackson, and Ferreira's boyfriend.

There also was evidence that, a few days after the crime, the defendant was seen coming and going on one occasion from a residence where a firearm linked to the shooting later was found. Detective Brian Guiney testified that, in the late evening of January 19, 2009, he was in the area of a residence located at 55 Nautical Way in Hyannis, which is two and one-half miles from Pontiac Street. He saw the defendant leave that residence through the rear sliding door, walk down a wooded path, and then return and enter the house through the same rear door. Guiney further testified that, a few days later, on January 23, 2009, he was present at 55 Nautical Way when police removed a .32 caliber Colt semiautomatic handgun and a box of .32 caliber ammunition from 55 Nautical Way. Both the handgun

and the ammunition were discovered in the basement; the handgun was found in the rafters, and the ammunition behind a couch.

In cross-examining Guiney, defense counsel established that two individuals other than the defendant had been charged with, and convicted of, possession of the handgun and ammunition found at 55 Nautical Way. On redirect examination, Guiney was asked but did not recall whether he had seen the defendant with those individuals within two weeks before or after the date of the shooting.

Ballistics testing revealed that the handgun was the source of a spent projectile and four discharged cartridge casings found at the crime scene. However, there was no forensic evidence tying the defendant to the handgun or related items. No fingerprints were found on either the handgun or the box of ammunition. A partial deoxyribonucleic acid (DNA) profile retrieved from the discharged cartridge casings was determined to be from an unknown female source. Swabs from the handle, trigger, and slide of the handgun showed a mixture of DNA from three individuals, but comparison with the defendant's DNA profile was inconclusive.

More than a year after the shooting, in the summer of 2010, the defendant approached and spoke to Ferreira. At trial, Ferreira testified that he said, "I heard what happened. I'm sorry that happened to you." She also denied ever reporting the

conversation differently to the police.  The Commonwealth later called Detective Colin Kelley, who testified that Ferreira had told him that the defendant had "apologized," saying that "he didn't mean to shoot at her and [Asack], and that they weren't the intended target."  Kelley's version of Ferreira's statement was received for impeachment purposes, and was accompanied by a limiting instruction.

During the testimony of an employee of the Barnstable County sheriff's department, the Commonwealth played recorded excerpts from four telephone calls made by the defendant from jail in February, 2009.  Prior to trial, the Commonwealth had argued, and the judge agreed, that the jury could infer from the calls that the defendant was orchestrating efforts to influence the testimony of a female witness in this case, and that the evidence, therefore, was admissible to show consciousness of guilt.

The defense did not call any witnesses, but during his cross-examination of the Commonwealth's witnesses, defense counsel tried to cast doubt on the defendant's involvement in the shooting.  Counsel confronted Ferreira with her grand jury testimony identifying an individual named Denzel Chisholm as the person who had sold them the marijuana.  Counsel also pointed to a potential third-party culprit who lived close to Pontiac Street and had been the subject of a drug investigation.  In his

opening statement, counsel indicated that the defendant would prove that he was home with his mother at the time of the shooting, but no such evidence was forthcoming.

Discussion. 1. Handgun evidence. The defendant argues that the Commonwealth failed to show a sufficient connection between him and the .32 caliber Colt semiautomatic handgun found at 55 Nautical Way, and, therefore, "evidence of this firearm" should have been excluded.[4]

a. Standard of review. As a threshold matter, we must determine the appropriate standard of review. Although both the defendant and the Commonwealth appear to assume that the issue was properly preserved, the record demonstrates that it was not.

Prior to trial, the Commonwealth filed a motion in limine seeking to admit "evidence of defendant's access to firearms and ammunition." The motion identified the following proposed evidence:[5] (1) that, on January 19, 2009, surveillance officers saw the defendant leaving and returning to 55 Nautical Way after

---

[4] We understand this claim to relate not only to the admission of the actual handgun, which, in turn, led to evidence that it matched shells found at the crime scene, but also to the testimony that the handgun was recovered from a location where the defendant was seen a few days after the shooting. We refer collectively to this evidence as "the handgun evidence."

[5] The defendant failed to provide us with the Commonwealth's motion in limine. (The appendix to his brief includes only his opposition to the motion.) We have exercised our discretion to obtain a copy of the motion and supporting memorandum from the trial court.

completing the sale of oxycodone to a cooperating confidential informant; (2) that, on January 23, 2009, Barnstable police executed a search warrant at 55 Nautical Way and found a .32 caliber handgun and .32 caliber ammunition; and (3) that the handgun seized from 55 Nautical Way was the same firearm that discharged shell casings and a spent projectile at the crime scene. In support of the motion, the Commonwealth argued, inter alia, that two brothers who lived at 55 Nautical Way were the defendant's associates in a narcotics distribution business operated out of that location, but no such evidence was introduced at trial.

The defendant filed a written opposition denying his involvement in any controlled sale and further denying that he had entered or returned to 55 Nautical Way as alleged. The defendant also claimed entitlement to the disclosure of the identity of the informant in order to dispute the testimony of the surveillance officers. Finally, the defendant argued that the proposed evidence was not relevant or, in the alternative, that any relevance was outweighed by the prejudicial effect of this "subsequent bad act" evidence.

The judge's initial reaction to the parties' arguments was that the surveillance officers could testify to their observations of the defendant as long as they gave no explanation of why they were present, but that further inquiry

was needed to determine whether the defendant was entitled to the identity of the informant. The judge therefore conducted an in camera hearing with the two detectives who performed the surveillance. As a result of their testimony, the judge found that the informant was not in a position to have made any relevant observations, and, hence, there was no need to disclose his identity. The judge also determined that only one of the detectives, Guiney, could have seen the defendant come and go from the residence.

The judge's final ruling on the motion in limine was that only Guiney would be allowed to testify, and that his testimony would have to be "tight" and avoid any mention of why he was there. Counsel voiced no dissatisfaction with the judge's rulings, and the judge said nothing to suggest that counsel was relieved of his obligation to make timely objection at trial. During Guiney's trial testimony, counsel lodged no objection, including at the point when the prosecutor offered the handgun and ammunition in evidence. To the contrary, when the offer was made, defense counsel explicitly said, "No objection."[6]

It is evident from what transpired that, despite the defendant's opposition to the Commonwealth's motion in limine

---

[6] The transcript suggests that counsel's response may have taken the judge by surprise. When counsel said, "No objection," the judge said, "I'm sorry?" at which point defense counsel again said, "No objection."

seeking to admit "evidence of defendant's access to firearms and ammunition," he did not preserve the issue for appeal. See Commonwealth v. Whelton, 428 Mass. 24, 25 (1988); Commonwealth v. Jones, 464 Mass. 16, 18-19 & n.4 (2012); Commonwealth v. Lawton, 82 Mass. App. Ct. 528, 538 (2012); Mass. G. Evid. § 103(b) (2015). We therefore consider the defendant's claim only to determine whether the challenged evidence was improper and, if so, whether it created a substantial risk of a miscarriage of justice. See Commonwealth v. Haggett, 79 Mass. App. Ct. 167, 174 (2011).

b. Analysis. The issue of the admissibility of the handgun evidence is an evidentiary one, to be considered in light of the principles of relevancy and its limits.[7] See Mass. G. Evid. §§ 401, 403 (2015). "Evidence is relevant if it has a rational tendency to prove a material issue. To be relevant, evidence need not establish directly the proposition sought; it must only provide a link in the chain of proof. The trial judge has substantial discretion in deciding whether evidence is relevant, and whether the prejudicial implications of such

---

[7] Here, and in connection with other issues presented, the defendant's brief includes conclusory assertions of violations of his constitutional rights under provisions of the United States Constitution and the Massachusetts Declaration of Rights. These "unsubstantiated, superficial claim[s do] not rise to the level of adequate appellate argument, and we do not consider [them.]" Commonwealth v. Dinquis, 74 Mass. App. Ct. 901, 901 n.4 (2009). See Mass. R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

evidence outweigh its probative value." Commonwealth v. Scesny, 472 Mass. 185, 199 (2015) (quotations and citations omitted).

Cases involving the admissibility of weapons and weapons-related items generally arise in two different contexts. Where the proffered evidence was or could have been used in the course of a crime, it is relevant and admissible in the judge's discretion to prove that a defendant had the "means" to commit the crime. See, e.g., Commonwealth v. Williams, 456 Mass. 857, 871 & n.11 (2010). Where the proffered evidence could not have been used in the commission of a crime, it still may be relevant and admissible in the judge's discretion to prove the defendant's "access" to and "familiarity" with such items. See, e.g., Commonwealth v. Ridge, 455 Mass. 307, 309, 322-323 (2009). In either context, weapons-related evidence is likely to carry a risk of prejudice, but because evidence of a weapon that could not have been used in the crime is of weaker probative value than evidence of a weapon that was or could have been used in the crime, its relevance may be less likely to outweigh the risk of prejudice. See Commonwealth v. Toro, 395 Mass. 354, 356-357 (1985). Still, evidence of a weapon that could not have been used in the crime is not "unconditionally disapproved." Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012). Depending on the circumstances, it may be admitted, with appropriate limiting instruction. See Commonwealth v. Ridge, supra at

322-323.  See also <u>Commonwealth</u> v. <u>McGee</u>, 467 Mass. 141, 157-158 (2014).

Another factor bearing on admissibility, however, is the existence of a nonspeculative link between the defendant and the evidence.  For example, there was a sufficient link in <u>Commonwealth</u> v. <u>Beliard</u>, 443 Mass. 79, 88 & n.8 (2004), where the handgun used in the crime charged was the same handgun that had been used in a home invasion to which the defendant's brother had pleaded guilty, <u>and</u> the defendant resided with his brother.  On the other hand, there was an insufficient link in <u>Commonwealth</u> v. <u>Barbosa</u>, <u>supra</u> at 123, where ammunition and a magazine that could not have been used in the crime charged were found in the common area of an apartment the defendant shared with four other adults.

In the present case, the only trial evidence tying the defendant to the handgun was Guiney's testimony that, a few days after the shooting, he saw the defendant on one occasion, leaving and returning to a residence at 55 Nautical Way through the back door, and that four days later police recovered the handgun from the basement rafters of that residence.  There was no DNA or fingerprint evidence linking the defendant to the handgun; and no evidence that he ever was seen with the handgun or, for that matter, any other firearm.  Nor was there evidence that the defendant lived at or frequented 55 Nautical Way, much

less that he had access to the basement where the handgun was secreted.

There also was no evidence identifying the individuals who lived or frequented 55 Nautical Way, and no evidence of the relationship of such individuals to the defendant or to the shooting.  Thus, not only was there no evidence of an individual connection between the defendant and the handgun, but there also was no evidence of a connection between the handgun and any potential coventurer.  Compare Commonwealth v. Rosa, 468 Mass. 231, 237-238 & n.8 (2014) (casings and live rounds found in coventurer's bedroom could be inferred to be connected to guns used in murder with which defendant was charged; at a minimum the evidence tended to show that at least one of the perpetrators had access to the means of committing the crime).

The thinness of this showing was due in no small part to rulings favorable to the defendant.  The judge would not allow the Commonwealth to introduce testimony from one of the detectives that the defendant lived at 55 Nautical Way based solely upon a conversation, in November, 2009, in which the defendant referred to "Nautical" as his "neighborhood."  The judge also restricted the Commonwealth's inquiry into Guiney's knowledge of the defendant's relationship with two individuals who were convicted of possessing the handgun.  The prosecutor was only able to ask whether Guiney had seen the defendant with

those individuals within two weeks before or after the shooting, and Guiney responded that he did not recall.

Reduced to its essence, the defendant's position on appeal is that the judge should have gone even farther and excluded the handgun evidence altogether. Specifically, the defendant contends that only a showing that he personally or constructively possessed the handgun would have been enough to justify admission. That contention is not correct, at least in the context of a case where the defendant is alleged to have participated in a joint venture. See Commonwealth v. Rosa, supra at 237. But the defendant's broader point -- that the connection between the defendant and the handgun was too attenuated to endow the handgun evidence with sufficient probative value to outweigh its prejudicial effect -- has considerable force.

We need not decide the issue, however, because whether or not the handgun evidence was improper, the defendant is not entitled to appellate relief. The existence of error is only one factor that we consider in determining whether there is a substantial risk of a miscarriage of justice. We also consider whether the defendant was prejudiced, whether in the context of the entire trial it would be reasonable to conclude that the error materially influenced the verdict, and whether we may infer from the record that counsel's failure to object was not a

reasonable tactical decision. See Commonwealth v. Randolph, 438 Mass. 290, 297-298 (2002). Relief under this standard is seldom granted and is appropriate only where all four factors are satisfied. See ibid.

Here, even if the handgun evidence was erroneously admitted and prejudicial, the very weakness of the connection between the defendant and the handgun suggests that it would not have materially influenced the verdict, especially when considered alongside the properly admitted evidence of the defendant's guilt. The defendant was known to the victims. The two victims who testified both identified him as the person whom they contacted to purchase marijuana, and telephone company records confirmed the calls. Ferreira placed him at the scene of the shooting minutes before gunfire erupted, and described him as wearing clothing like that of the shooters. The defendant had been the one to provide the victims with unsatisfactory marijuana and to set the location for them to meet again. He walked away just minutes before the shots began, on what could be inferred to be a pretext -- forgetting to bring the marijuana that he had just arranged to exchange. There was evidence of prior tension between two of the victims and friends of the defendant, and, as we discuss below, the defendant's calls from jail evinced consciousness of guilt.

Most significant to our analysis, however, is that counsel's failure to preserve the defendant's rights was not a mere oversight; it was an explicit abandonment of his prior opposition to the introduction of the handgun evidence. Counsel not only did not object to Guiney's testimony; when the handgun and ammunition were offered, he affirmatively stated on the record that he had no objection. He then used the opportunity presented by Guiney's testimony to further the defense that there were third-party culprits by eliciting that two other people had been charged with, and convicted of, possession of the handgun used in the crime. On this record, we are unable to infer that counsel's failure to object was not simply a reasonable tactical decision.

2. Recorded telephone calls. Prior to trial, the Commonwealth filed a motion in limine to admit excerpts from four recorded telephone calls made by the defendant from jail. The Commonwealth contended that it could be inferred from the defendant's statements that he was orchestrating an attempt to influence the testimony of a female witness. The defendant filed his own motion in limine to preclude the Commonwealth from introducing the recordings, claiming, among other things, that they were irrelevant and highly prejudicial. After reviewing the content of the calls, and learning that this was the only case pending against the defendant at the time they were made,

the judge ruled that the Commonwealth's proffer was sufficient to allow the jury to hear the evidence. The defendant renewed his objection at trial, and we therefore review for prejudicial error. See Commonwealth v. Rosa, 468 Mass. at 239.

The defendant's first argument is that the admission of two calls referring to plea negotiations violated Mass.R.Crim.P. 12(f), as appearing in 442 Mass. 1511 (2004).[8] However, because the defendant's statements were made to someone who had no authority to negotiate a plea, the judge properly admitted them under the authority of Commonwealth v. Boyarski, 452 Mass. 700, 709 (2008). See Commonwealth v. Wilson, 430 Mass. 440, 443 (1999).

The defendant next challenges the relevance of the calls, claiming that they did not relate to the defendant's case. However, despite the use of oblique language, the defendant's statements were susceptible to the interpretation that he was directing the recipient of the call to contact a female witness and persuade her to provide favorable testimony.[9] The judge did

---

[8] In the first call, the defendant tells the other party that he needs to know promptly whether an unidentified female is willing to "sing" and "do the hook," because he has to decide whether to take a plea the next day. In a later call, the defendant describes a plea offer he received, the counteroffer he proposed, and the judge's rejection of the deal because "the girl" was "complaining," "crying," "sitting in the courtroom."

[9] In a conversation that took place three days after the defendant's arrest, the defendant asks, "Did you talk to that

not err in admitting the evidence and leaving it for the jury to evaluate.

The defendant also argues for the first time on appeal that the statements of the recipients of the calls were inadmissible hearsay and violated the defendant's confrontation clause rights. There was no error and, therefore, no substantial risk of a miscarriage of justice. The recipients' statements provided context for the relevant and admissible statements made by the defendant in the same conversation. See Commonwealth v. Mullane, 445 Mass. 702, 711 (2006). They were not admitted for their truth and were neither hearsay nor testimonial. Furthermore, the defendant has not identified anything damaging in the recipients' statements that is not also present in the defendant's own statements.

The defendant's final argument concerning the calls is that their admission caused him undue prejudice by bringing attention to his incarceration and his use of offensive language. However, for reasons similar to those explained in Commonwealth v. Rosa, supra at 241-242, we discern no abuse of the judge's

---

[expletive] girl?" Then he states, "[M]ake sure they didn't try to get in contact with her." In a later conversation, the defendant directs the other person not to be mad "at his girl," and to tell her that the defendant was "good," and "chillin'" and the "wrong person." In another call, the defendant discusses rap music and asks the other party to see if the girl will "sing the chorus." In the fourth call, the defendant refers to the girl as "a snitch," and discusses whether she will "show up."

broad discretion to weigh the probative value of the evidence against any prejudicial effect it might have on the jury.

3. Other issues. Little need be said concerning the defendant's remaining claims.

a. There was no evidence that other jurors were exposed to extraneous influence as a result of juror no. 2's realization, after only one witness testified, that one of the victims had been her student four years earlier. Accordingly, there is no merit to the defendant's new claim on appeal that, in addition to inquiring of juror no. 2 and, at the defendant's request, discharging her, the judge also was required to conduct an individual voir dire of the remaining jurors. See Commonwealth v. Fidler, 377 Mass. 192, 199-201 (1979); Commonwealth v. Tanner, 417 Mass. 1, 4-5 (1994).

b. The Commonwealth's prosecution of the defendant on the theory that he knowingly participated in the commission of the crime charged, alone or with others, while he had the shared intent required for that crime, see Commonwealth v. Zanetti, 454 Mass. at 470, was not factually inconsistent with the Commonwealth's prosecution of two other individuals for possession of the firearm found at 55 Nautical Way, and did not violate due process. See Commonwealth v. Keo, 467 Mass. 25, 36-39 (2014).

c.  As the defendant has raised no successful issue, there was no cumulative error entitling him to appellate relief.

<u>Judgments affirmed.</u>